[Civ. No. 9567.   Third Dist.   July 30, 1959.]

PAUL W. NEILSEN, Respondent, v. JOE UYECHI, Appellant.

J. CLAIRE VEATER et al., Respondents, v. JOE UYECHI, Appellant.

Hansen, McCormick, Barstow & Sheppard, C. Ray Robinson and A. B. Canelo for Appellant.

Forrest M. Greenberg and Kroloff, Brown, Belcher & Smart for Respondents.

VAN DYKE, P. J.—This is an appeal by the defendant and cross-complainant, Joe Uyechi, from a judgment on jury verdicts in favor of the plaintiffs and cross-defendants in personal injury and property damage actions which were consolidated for trial.

The actions arose out of a collision wherein appellant's truck driven by one Valenzuela collided with the parked truck of plaintiff-respondent Neilsen, which was being operated by plaintiffs J. Clair and L. Douglas Veater, who are brothers and who were working for Neilsen as a driving team. Valenzuela died intermediate the filing of the actions against appellant and the trial.

No issue is raised as to the sufficiency of the evidence to support the verdicts on the issue of liability. Appellant's contentions are that the trial court erred in its refusal to give certain instructions and that the damages awarded were excessive. In order to discuss these contentions, we will summarize the evidence.

The accident occurred about 3:30 a.m. on United States Highway 99 in Merced County. Valenzuela had been driving northerly in the outside lane of a four-lane highway. His equipment consisted of a truck-tractor pulling a set of trailers. It is undisputed that he was driving for appellant and that his negligence, if any, was to be imputed to appellant. The front right end of his tractor struck the hind left corner of the equipment being driven for Neilsen by Clair Veater. At that moment his brother, Douglas, was asleep in a space provided for that purpose. The Neilsen equipment was parked along the right side of the highway, and whether it was parked lawfully off the travel lane or unlawfully and partly on the right side of the travel lane was in issue. The evidence on that issue was conflicting. For some time one Zeering had been driving a car following appellant's rig, and, as a witness for respondents, he testified in substance as follows: Zeering was

driving an empty truck and trailer north. He had been following appellant's rig for several miles. Both were going from 40 to 45 miles per hour and were in the outside lane. Zeering noticed the lights of Neilsen's rig while a considerable distance away. It appeared to be off the shoulder. As he got close, Zeering could see that the front end of the Neilsen rig was off the travel lane, but appellant's rig blocked his view of the rear of Neilsen's rig, and he could not say whether or not that part of Neilsen's rig was on the roadway. It could have been. Appellant's truck had been traveling straight without weaving, and it never left the main-traveled portion of the highway. (It was undisputed that at the place of the accident there was a paved or oiled shoulder which was approximately seven feet wide, and beyond that was a dirt shoulder two or three feet wide which was fairly level; that Neilsen's rig was not over eight feet wide and could have been parked completely off the travel lane; that when parked by Neilsen's driver it was not disabled so far as movement was concerned.) Zeering further testified that as he approached the point of the accident an automobile passed him on the inner lane and was abreast of appellant's rig at the time of the collision. It was crowding the white line between the two travel lanes. It had passed very close to Zeering's truck—so close that it bothered him. It was being driven just as close as that to appellant's rig, if not closer. After the collision Valenzuela had a large knot on his head, appeared a little dazed, told Zeering he had been knocked out. He was "teetering a little bit." He said: "I must have went to sleep," and immediately thereafter said: "I couldn't have went to sleep" and also said: "I must have not went to sleep."

Autry, an investigating patrol officer, testified that he went to the scene of the accident with his fellow officer, Puckett. He asked Valenzuela what happened, and the latter said: "I don't know. I must have gone to sleep." Officer Puckett testified that he took a statement from Valenzuela. He was a witness for appellant. Under direct examination there was read into evidence Puckett's written report of his conversation with Valenzuela. It follows: Mr. Valenzuela stated he was northbound on 99 at a speed of 40 to 45 miles per hour; "there was a car passing me and I pulled over to the right as this car was too close. I did not pull far enough to the right to get on the shoulder. I saw a truck parked on the shoulder and this truck had his blinkers on. Just as I approached the

truck that was parked on the shoulder and at the same time the vehicle that was passing was about even with the cab of my truck, it appeared that the truck that was parked was about a foot onto the roadway. I did not have a chance to apply the brakes, and I couldn't pull to the left due to a car that was passing.'' Valenzuela made no statement to Puckett about having gone to sleep. Puckett, while stating that it was difficult when he examined the scene of the collision to accurately place the point where the impact occurred, nevertheless fixed that point approximately as having been 14 inches inside the travel lane on which appellant's rig was being driven.

Clair Veater, Neilsen's driver, started driving at Fresno, and his brother, Douglas, went to sleep in the sleeping compartment. He testified that the weather was clear and dry; that he had driven to the point where the collision ultimately occurred when he noticed his clearance lights flicker and go out. He immediately flipped his turn indicators so that they would all flash and pulled over to the side. He turned on his backing lights, rear blinkers and left headlights and set his brake, which last action turned on the brake lights. He checked his lights. He found all were working and on except for the clearance lights. He then checked his brakes and tires. Various trucks and cars passed him meanwhile, including two large diesels going side by side up the highway. All the right wheels of his equipment were on the dirt shoulder. His left wheels were off the concrete portion of the roadway. While working on his clearance lights he saw the defendants' truck swerve toward him, and the collision occurred. When he saw the truck swerve toward him he was ''petrified.''

■ Appellant requested and the court refused to give the following instruction:

''In passing upon whether or not the deceased, Leo Valenzuela, was guilty of negligence, you are instructed that the California Code of Civil Procedure sets forth certain presumptions which are denominated disputable presumptions, which may be controverted by other evidence, but which are satisfactory if uncontradicted. Among those presumptions are the following:

''That the law has been obeyed.

''That a person takes ordinary care of his own concerns.''

The requested instruction ought to have been given ■ In *Gigliotti* v. *Nunes*, 45 Cal.2d 85, 93 [286 P.2d 809], it is stated:

''Although there is no room for the presumption where the

driver or other person whose claimed negligence is at issue himself testifies to his actions at the time involved (*Speck* v. *Sarver* (1942), 20 Cal.2d 585, 587-588 [128 P.2d 16]), the rule is established that if such person be deceased or unable to testify by reason of loss of memory, the fact that other witnesses for the parties testify fully as to the acts and conduct of the allegedly negligent person does not deprive the party relying on the presumption of the benefit thereof unless the testimony which he himself produces 'under circumstances which afford no indication that the testimony is the product of mistake or inadvertence . . . is wholly irreconcilable with the presumption sought to be invoked.' "

All of the conditions justifying the giving of the requested instruction are present in this record. The negligence of Valenzuela was at issue. Appellant's liability depended upon respondents' ability to prove that Valenzuela had been negligent since his employer could only be held on the basis of imputing Valenzuela's negligence to his employer. He was dead. The evidence introduced by appellant concerning his conduct was not irreconcilable with the presumption of due care. The only evidence of Valenzuela's conduct placed in the record by appellant was the statement he made to Officer Puckett, which we have quoted, including some references to statements made to Officer Autry, and by him repeated to Officer Puckett, that Valenzuela had said he must have gone to sleep. Valenzuela's reported statement to Puckett is obviously not irreconcilable with due care. A mere reading of that statement establishes this. His related statement to Autry is conclusionary in nature. He did not say he did go to sleep, and his statement made at the scene of the accident to Officer Puckett indicates that he had not gone to sleep since he described the occurrence up to and after the actual collision.

The principal contention of appellant at the trial was that the Neilsen rig had been unlawfully stopped so that a part of it projected onto the travel lane. Appellant requested the following instruction:

"Section 582 of the Vehicle Code of California provides as follows:

" 'Upon any highway in unincorporated areas no person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the main traveled portion of the highway when it is practicable to stop, park or leave such vehicle off such part or portion of said highway . . .

" " 'This section shall not apply to the driver of any vehicle which is disabled in such a manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle on the main traveled portion of a highway.'

"A violation of this provision of the Vehicle Code is presumptively an act of negligence, and in the absence of legal excuse or justification, constitutes negligence as a matter of law."

The trial court eliminated from the instruction as given the last sentence of the instruction stating the legal effect of a violation of the section. Since there was no other equivalent instruction given to the jury, informing the jury of the legal effect of the violation of a statute which sets up a statutory standard of conduct, it was error to omit from the instruction the last sentence. By other instructions the court gave to the jury the standard of the ordinarily prudent person. Appellant was entitled to have the statutory standard given. As has been related, there was testimony that Neilsen's rig had been unnecessarily parked so that it projected into the travel lane and that this had been done at a point where it was entirely feasible to park completely off the travel lane so that any vehicle being driven along that lane could not have collided with Neilsen's rig. In fact the record discloses that if Neilsen's rig was thus unlawfully parked, there could have been no showing of legal excuse or justification for the statutory violation.

Respondents advance an argument that there was no direct proof that Valenzuela had died. Technically that is correct in the sense that no witness so testified. However, no one can read the record without being convinced that there was in fact no issue upon the point. Appellant's counsel, in his opening statement at the beginning of the trial, after the statement of respondents' counsel had been made, referred to the death of Valenzuela. Before evidence taking began, the trial court called a conference in chambers with counsel and a full discussion was there had as to the propriety of an instruction on the presumption of care in view of the death of Valenzuela. The matter was fully discussed. Various statements were made, including some by counsel for respondents, which statements were never controverted that Valenzuela had died. The same condition of the record appears on the proceedings for new trial, where at various times in the arguments of both sides, during discussions as to the claimed error in failing to give an instruction concerning the presumption of

due care on the part of Valenzuela, references were made to the fact of his death. Not until the filing of respondents' brief herein has the point been raised of the technical lack of proof that Valenzuela had died. The objection comes too late. Clearly this case was tried upon the assumption that there was no issue as to the fact of death, nor is there now any contention but that the proof could have been readily afforded had anyone considered that it was necessary. Under such circumstances it would be grossly unjust for this court on appeal to do otherwise than to hold as we do that the technical lack of proof here asserted is unavailable to respondents.

It is unnecessary to discuss appellant's contentions as to the damages being excessive other than to say that we could not from this record sustain that contention, particularly in view of the fact that the same contention was presented to the trial court on new trial proceedings and that court, in the exercise of its discretion, substantially reduced the verdicts save as to the property damage verdict, the proper amount of which had been stipulated. In view of this action of the trial court, we are satisfied that it could not be said that the damages given as reduced were excessive.

It remains to consider the question of whether or not the errors hereinbefore discussed were such as to justify reversal. Respondents contend that they are not, and appellants argue to the contrary. We need only refer, without quoting, to the constitutional directive upon the subject. In *People* v. *Watson,* 46 Cal.2d 818 at pages 836-837 [299 P.2d 243], the Supreme Court stated the test to be applied in the following language:

''Giving due consideration to the varying language heretofore employed in relating the constitutional amendment to the particular situations involved, it appears that the test generally applicable may be stated as follows: That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error. Phrasing the test in this language avoids any complexity which may be said to result from the language employed in the double negative approach, and such phrasing seems to coincide with the affirmative language used in the constitutional provision. We are of the view, however, that the test as above stated does not constitute a departure from the tests heretofore applied, but is merely

a crystallization in affirmative form of the guiding principle which the courts have sought to enunciate in phrasing the test in other language. For example, the application of the double negative approach, as stated in some of the recent decisions, presupposes that a reversal will result only when there exists, in the opinion of the court, at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result. But the fact that there exists at least such an equal balance of reasonable probabilities necessarily means that the court is of the opinion 'that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' Thus, it appears that the tests, as variously stated, are not fundamentally different but, on the contrary, are essentially the same. Nevertheless, the test, as stated in any of the several ways, must necessarily be based upon reasonable probabilities rather than upon mere possibilities; otherwise the entire purpose of the constitutional provision would be defeated.''

Applying the test as above stated to the record before us, we are of the opinion that it is reasonably probable that a result more favorable to appellant would have been reached in the absence of the errors.

The judgment appealed from is reversed.

Schottky, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied September 22, 1959. Traynor, J., was of the opinion that the petition should be granted.