[Civ. No. 33832. First Dist., Div. Two. Oct. 15, 1975.]

CHARLES BEDOLLA, as Receiver, etc., et al.,
Cross-complainants and Appellants, v.
LOGAN & FRAZER et al., Cross-defendants and Respondents.

122

COUNSEL

Kubby, Pritchard & Cohen, Lee J. Kubby, Greenberg, Bernhard, Weiss & Karma, Herbert A. Bernhard and Stephen H. Marcus for Cross-complainants and Appellants.

Foley & Foley, Robert M. Foley and Carl D. Liggio for Cross-defendants and Respondents.

OPINION

**KANE, J.**—Cross-Complainants Parkside Development Company, a limited partnership, and Charles Bedolla, receiver for Parkside Develop-

ment Company (hereinafter "Parkside" or "appellant") appeal from the trial court's judgment entered on jury verdicts finding that the claims raised in the cross-complaint were barred by the statute of limitations. The intricate factual background leading to the controversy may be set out as follows:

Commencing in 1953, Richard H. Grant ("Grant") and Way Choy Ching ("Ching") solicited funds from the Chinese American community in Honolulu, Hawaii, to invest in and develop real estate in California. The vehicle used for this purpose was Parkside, a California limited partnership whose two general partners of record were Wong and Leong. Grant and Ching, who actually conducted the business of the limited partnership, were officially named as Parkside's managers.

From 1953 to 1968[1] respondents, a certified public accounting firm, provided services for both Parkside and affiliate entities which were owned or controlled by the limited partners and/or Grant and Ching. In discharge of their professional duties, during the period 1955-1961 respondents issued annual reports on Parkside's financial status. These financial statements clearly indicated that Parkside was sustaining substantial losses, that the partners' capital accounts were decreasing,[2] and also that there had been transactions between Parkside, Grant and Ching and various affiliates of both Grant and Ching and the limited partners.

In the wake of the continuous financial losses, some of the limited partners became dissatisfied. After certain initial steps taken in 1957, in 1960 six of the Hawaiian limited partners retained Leon Chun, a Honolulu attorney, to investigate the matter. Chun referred the case to Greenberg, Shafton and Schlei, a Los Angeles law firm, which, in turn,

---

[1] In 1962 Logan and Frazer were dissolved and merged into Arthur Young & Company.

[2] The financial statements embracing the period 1955 through 1961 showed the following picture:

| Fiscal Year Ended | Gain or (Loss) | Partners' Capital Accounts At Year's End |
|---|---|---|
| February 28, 1955 | $ 92,086 | $1,217,086 |
| February 29, 1956 | 63,541 | 1,133,729 |
| February 28, 1957 | (249,563) | 878,165 |
| February 28, 1958 | (169,919) | 703,746 |
| February 28, 1959 | (133,697) | 567,424 |
| February 29, 1960 | ( 32,202) | 533,721 |
| February 28, 1961 | ( 22,337) | 397,383 |

associated Lee J. Kubby, a Sunnyvale attorney. The attorneys hired Main-La Frentz and Company, a certified public accounting firm, to assist in the investigation. The investigation revealed inter alia that the limited partners had suffered severe losses which had reduced their original $1,125,000 capital investment to $335,000; that there had been self-dealings between Parkside and the affiliate companies in which some of the limited partners and Grant and Ching had interests; that Grant and Ching had made excessive profits on some of these transactions; that Grant and Ching had improperly diverted properties from Parkside to the entities they personally owned or controlled; that Grant and Ching were receiving salaries they were not entitled to receive; and that a number of the limited partners had not received the financial information prepared by respondents.

Based upon the foregoing investigation, the 6 limited partners instituted a class action on behalf of all 31 limited partners for fraud and breach of fiduciary duty. The action was brought in the United States District Court for the Northern District of California in 1960 (hereinafter "*Chow* action"), and named as defendants Grant, Ching, their wives, Leong and two companies (Parkside Plaza Co. and Lado Madera Co.) owned by Grant and Ching.

Following commencement of the *Chow* action, Mr. Kubby, counsel for plaintiffs, petitioned the federal court for the appointment of a receiver. After extensive hearings held between October 8, and November 15, 1960, on January 9, 1961, C. L. Scranton was named as an "appointee." According to the evidence presented in the case at bench, Scranton acted in the capacity of a general partner; had dominion over the books and records of Parkside; signed checks; and was given veto power over the decisions of Grant and Ching.

In the *Chow* action, final judgment was rendered for the limited partners on April 5, 1968. The interests of the two named general partners, who were but the pawns of Grant and Ching, were terminated, and Grant and Ching were found to be de facto partners. The court concluded that Grant and Ching were guilty of fraud and breach of fiduciary duty, and accordingly awarded the limited partners a promissory note in the face amount of $3 million, a shopping center having an initial cost in excess of $1 million, and money damages in the sum of $1,581,051. At the same time the court appointed Charles Bedolla as receiver for Parkside. In 1970, a trust was established into which all of Parkside's properties, including those recovered from Grant and Ching,

were transferred. Mr. Kubby and his associate counsel were given a one-third interest in the trust as their fee for handling the *Chow* action.

In connection with the *Chow* action, respondents provided services for Parkside. When the payment of their bill totaling $5,000 was declined by Scranton, in 1964 respondents brought an action against Parkside on an open book account and account stated. Parkside's answer to the complaint and its cross-complaint were filed on August 12, 1969, five years after the initiation of the original action. The cross-complaint praying damages in the sum of $3,162,102 alleged causes of action against respondents for fraud, breach of fiduciary duty and professional negligence, all assertedly committed between March 1, 1953, and September 14, 1960. On July 27, 1970 the court dismissed respondents' complaint for failure to bring the action to trial within five years after the filing of the complaint. On the issues raised by the cross-complaint, a jury trial was had. The trial court bifurcated the issue of statute of limitations and presented that question to the jury before consideration of the merits of the case. After receiving extensive evidence, the jury rendered verdicts for respondents by finding that the claims contained in the cross-complaint were barred by the statute of limitations. The appeal at hand is taken from the judgment entered on the jury verdicts.

As we have already pointed out, Parkside's cross-complaint asserted causes of action based on fraud and professional negligence. While the statutes of limitation for fraud and professional negligence are three and two years respectively (Code Civ. Proc., §§ 338, subd. 4, 339, subd. 1), in each instance the statute commences to run only when the wrongful acts are discovered or with reasonable diligence could have been discovered (*National Automobile & Cas. Ins. Co.* v. *Payne* (1968) 261 Cal.App.2d 403, 409 [67 Cal.Rptr. 784]; *Moonie* v. *Lynch* (1967) 256 Cal.App.2d 361, 365-366 [64 Cal.Rptr. 55]). Since it was alleged in the cross-complaint that the wrongful acts had been committed from March 1, 1953, through September 14, 1960, the cross-complaint on its face fell within the statute of limitations. Accordingly, the trial court instructed the jury that in order to overcome the prima facie bar, Parkside had the burden of proving that it did not know and should not have known of the material facts before December 30, 1962, as to the professional negligence count, and before December 30, 1961, insofar as the fraud count was concerned. At the same time the trial court also charged the jury that "to prevent the Statute of Limitations from having run and to prove that the Statute of Limitations was tolled, *plaintiff must prove that it, its agents, accountants, investigators, attorneys, predecessors in interest, and the limited partners*

*and appointee who stood in the same position as a general partner* of plaintiff or its agents, accountants, investigators and attorneys *did not know or with reasonable diligence should not have known of or discovered the alleged wrongful conduct of defendants prior to December 30th, 1961 on the fraud claim, and December 30th, 1962 on the negligence claim.* If plaintiff cannot prove this by a preponderance of the evidence, then your verdict must be for the defendants."[3] (Italics added.)

It seems obvious that the correctness of the aforecited jury instructions is crucial with regard to the determination of the present appeal. Relying on assertions of general legal and equitable policies and cases from outside jurisdictions, Parkside presses the argument that the jury instructions in controversy did not state the proper legal principles. In essence, Parkside contends that the knowledge of the limited partners and their agents should not be imputed to the partnership because (1) under the Uniform Limited Partnership Act (Corp. Code,[4] § 15501 et seq.) the management and control of the limited partnership is trusted to the general rather than the limited partners (§§ 15507, 15509), the limited partners are not the agents of the limited partnership and are not authorized to act on its behalf (§ 15526); (2) the limited partners, making an investment of capital and subject to liability to the extent of their investment only, are analogous to a shareholder of a corporation (*Lichtyger* v. *Franchard Corporation* (1966) 18 N.Y.2d 528 [277 N.Y.S.2d 377, 383, 223 N.E.2d 869]; 60 Am.Jur.2d, § 371, p. 254), and the corporation, under established law, is not charged with the knowledge of the shareholder (*Zinn* v. *Ex-Cell-O Corp.* (1944) 24 Cal.2d 290, 295 [149 P.2d 177]; *Blood* v. *La Serena Land and Water Co.* (1901) 134 Cal. 361,

---

[3]To the same effect is defendants' instruction No. 28(a), in which the court further explained that "The knowledge of an agent is imputed to the principal. This means that the knowledge that somebody whom you employ is considered knowledge that you have, even though you may not in fact know it. Applied to this case it means that *the knowledge of any of the lawyers and accountants and the appointee Mr. Scranton is knowledge that is imputed or belongs to the partnership,* even if the lawyer, appointee or accountant fails to tell his client. Thus, if you find that a lawyer, accountant or appointee has knowledge or should have knowledge, as a matter of law, you must find that his client also has knowledge.

"The fact that a client may have knowledge which is not told to his lawyer or accountant does not mean there is no knowledge. *The issue is what is the composite knowledge of all of the plaintiffs and their agents (i.e. lawyers, appointee and accountants)* regardless of whether or not they have conveyed that knowledge between themselves." (Italics added.)

It should be noted that in its instructions the court used the term "plaintiff" in reference to the cross-complainants and "defendant" in reference to the cross-defendants.

[4]Unless otherwise indicated, all references will be made to the California Corporations Code.

370 [66 P. 317]; (3) it would be inequitable to bar a limited partnership from bringing an action on account of the composite knowledge of the limited partners, particularly in the instance here presented, where the general partners to whom the business affairs of the limited partnership were entrusted had been the wrongdoers and during the critical period there was no one who would have been authorized to act or institute an action on behalf of the limited partnership. Although the issue here raised is one of first impression and there is no direct controlling authority in point, the principles derived from the partnership act and judicial authorities explaining the nature of a limited partnership lead to the conclusion that appellant's position must be rejected.

It is apparent from the foregoing contentions that appellant misconceives the nature of a partnership by erroneously assuming that a partnership, including a limited one, is a separate legal entity which, like a corporation, is distinct from the members thereof. Whatever may be the law elsewhere, California is committed to the view that a partnership in the eyes of the law is not a legal entity, even though it may be sued under the firm name pursuant to Code of Civil Procedure, section 338 (*Reed* v. *Industrial Acc. Com.* (1937) 10 Cal.2d 191, 192-193 [73 P.2d 1212, 114 A.L.R. 720]; *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 232 [69 Cal.Rptr. 251]; *Sonberg* v. *Bergere* (1963) 220 Cal.App.2d 681, 682 [34 Cal.Rptr. 59]; *Donroy, Ltd.* v. *United States* (N.D.Cal. 1961) 196 F.Supp. 54). As the court, elaborating on the Uniform Limited Partnership Act, put it, "In the State of California . . . a partnership, unlike a corporation, is considered to be, not a legal entity, but an association of individuals. Our attention has not been called to any authority to the effect that a limited partnership in this respect is any different from a general partnership. . . . *The UPA does not purport to create a new concept of separate legal identities as between the limited partner and the partnership, nor does it purport to create* for limited partnership in this respect *the separate legal entity concept applicable as between shareholder and corporation.*" (*Donroy, Ltd.* v. *United States, supra,* at p. 59; italics added.)

But, even if assumed arguendo that a limited partnership should be regarded as a separate legal entity, Parkside still cannot prevail. As aptly noted by appellant, the Uniform Limited Partnership Act is silent as to whether the knowledge of a limited partner may be attributed to the limited partnership. Under these circumstances, recourse must be had to

the general rules of law and equity (§ 15529[5]), and especially to the pertinent provisions of the Uniform Partnership Act (60 Am.Jur.2d, § 372, p. 255). This latter act, in turn, clearly states that notice to *any* partner operates as notice to the partnership, and the knowledge of *any* partner is to be imputed to the partnership.[6]

We are persuaded that equitable principles do not dictate a different result either. While as a general rule a limited partner may not bring a lawsuit on behalf of the limited partnership without assuming the liability of a general partner (cf. § 15507; *Vulcan Furniture Manufacturing Corp.* v. *Vaughn* (Fla.App. 1964) 168 So.2d 760, 763; *Lieberman* v. *Atlantic Mutual Insurance Co.* (1963) 62 Wn.2d 922 [385 P.2d 53, 56]), pursuant to section 15526,[7] the limited partner is allowed to sue the limited partnership and/or the general partners in order to enforce his rights against them. In such action the third party wrongdoers who colluded or conspired with the limited partnership or the general partners may be joined as party defendants (cf. *Lichtyger* v. *Franchard Corporation, supra*).

It goes without saying that in light of the aforestated rules the limited partners would have been entirely free to join respondents as defendants in the *Chow* action and could have enforced their claims against them as much as they did against the general partners. Besides, Parkside, as a limited partnership, was not prevented from bringing a timely action against respondents on its own behalf either. As pointed out before, as early as January 1961, when Parkside's claims were still actionable, Scranton was appointed by the federal court for the avowed purpose of overseeing and checking Parkside's business affairs. According to the evidence introduced at trial, Scranton stood in the position of a general partner and, as such, could have brought an action against respondents on behalf of the limited partnership well before the running of the statute of limitations.

[5]Section 15529 sets out that "In any case not provided for in this act the rules of law and equity, including the law merchant, shall govern."

[6]Section 15012 provides that "*Notice to any partner* of any matter relating to partnership affairs, *and the knowledge of the partner* acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, *operate as notice to or knowledge of the partnership*, except in the case of a fraud on the partnership committed by or with the consent of that partner." (Italics added.)

[7]Section 15526 provides that "A contributor, unless he is a general partner, is not a proper party to proceedings by or against a partnership, *except where the object is to enforce a limited partner's right against* or liability to *the partnership*." (Italics added.)

Finally, there is another reason why Parkside may not be allowed to enlist the aid of equity in the present action. It is obvious that the real parties in interest who stand to gain by the instant lawsuit are the very same limited partners who had initiated the *Chow* action in 1960 and pursued it to a fruitful conclusion in 1968. To put it bluntly, Parkside as an entity serves but a conduit to enforce the same claims that had already been litigated. This attempt, of course, runs counter to the basic premise that the entity concept cannot be invoked to achieve an unjust result (*Grober* v. *Kahn* (1966) 47 N.J. 135 [219 A.2d 601]; *Chisholm* v. *Chisholm Const. Co.* (1941) 298 Mich. 25 [298 N.W. 390]; 59 Am.Jur.2d, § 7, p. 933).

The foregoing discussion impels the conclusion that the trial court was eminently correct in advising the jury that the composite knowledge of the limited partners, their agents and appointee Scranton was imputable to Parkside and its evidentiary rulings based upon this premise must likewise be upheld.

■ Parkside's other principal claim is that the jury was erroneously instructed with regard to the burden of proof, the accrual of the causes of action and the running of the statute of limitations. As we shall explain *infra*, these contentions of appellant are not only unsupportable, but run directly contrary to established law.

Addressing the issue of burden of proof, we reiterate that an action for fraud must be brought within three years, but the cause of action is "not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud . . ." (Code Civ. Proc., § 338, subd. 4). The cases construing this code section have held that the provision tolling the operation of the statute until discovery is an exception, and, accordingly, plaintiff must affirmatively excuse his failure to discover the fraud within three years by showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry (*Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 437 [159 P.2d 958]; *National Automobile & Cas. Ins. Co.* v. *Payne, supra,* 261 Cal.App.2d at p. 409). The trial court's instruction is in full harmony with the above precepts and accurately lays down the applicable law.[8]

---

[8]The pertinent portion of the instruction reads as follows: "Plaintiff must prove by a preponderance of the evidence the following:

"(1) when the alleged wrongful acts were first discovered by it or its agents:

"(2) the circumstances under which discovery was made;

"(3) why plaintiff and its limited partners are not at fault for not having made an

Appellant's next claim that the jury should have been instructed that the statute of limitations begins to run only when a *diligent* inquiry would have uncovered the facts is likewise without merit. Contrary to appellant's assumption, it is blackletter law that the statute of limitations commences to run after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry (*National Automobile & Cas. Ins. Co.* v. *Payne; Hobart* v. *Hobart Estate Co.,* both *supra;* see also Civ. Code, § 19).[9] ■ As the court stated in *Vai* v. *Bank of America* (1961) 56 Cal.2d 329, 343 [15 Cal.Rptr. 71, 364 P.2d 247], " 'where a party defrauded has received information of facts which should put him upon inquiry, and the inquiry if made would disclose the fraud, *he will be charged with a discovery as of the time the inquiry would have given him knowledge.*' " (Italics added.)

Again, the instructions of the trial court accurately reflect the pertinent legal rules[10] and are not subject to legitimate complaint.

■ Parkside's third assertion that because of the fiduciary relationship between the parties the accrual of the causes of action was postponed until the actual discovery of fraud and/or professional negligence and that the jury should have been so instructed (*Hobart* v. *Hobart Estate Co., supra; Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176 [98 Cal.Rptr. 837, 491 P.2d 421]; *Moonie* v. *Lynch, supra*) is derived from an obvious misinterpretation of law. Thus,

---

earlier discovery; and

"(4) that it and its agents had no actual knowledge or presumptive knowledge of facts sufficient to put it on inquiry."

[9]Civil Code, section 19, sets forth that "Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact."

[10]The instructions in controversy provide as follows:

*"Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry, as to a particular fact, is charged with notice of the fact itself in all cases in which, by pursuing such inquiry, he might have learned such fact."* (Italics added.)

"Now in considering whether the Statute of Limitations has run, a person does not have to know every fact about his claim before the Statute of Limitations starts running. In fact, *he does not even have to know that he has a claim if he knows facts which are sufficient to put him or his agents on notice of a claim.* Thus, the fact that Parkside claims it did not know it had a claim against the accountants, does not mean the Statute of Limitations has been tolled. Parkside must also prove it had no reason to believe it had a claim against these defendants." (Italics added.)

*"If plaintiff* or his predecessors or any of the limited partners, their agents, appointee, accountants, investigators or attorneys *had notice* or information *of circumstances which would make them suspicious of the acts and conduct of defendants and inquiry* thereon, *if followed, would lead to knowledge of* the alleged *wrongful acts or conduct of defendants, they will be deemed* as a matter of law *to have had actual knowledge of such acts and conduct."* (Italics added.)

it bears special emphasis that *Hobart,* upon which appellant primarily relies, makes it abundantly clear that the general rules relating to pleading and proof of facts excusing a late discovery of fraud remain applicable to cases involving a confidential relationship. The only distinction between the rules of discovery in the ordinary fraud case and those in the confidential relationship category is that in the latter situation the duty to investigate may arise later by reason of the fact that the plaintiff is entitled to rely upon the assumption that his fiduciary is acting in his behalf. But, once the plaintiff becomes aware of facts which would make a reasonably prudent person suspicious, the duty to investigate arises and the plaintiff may then be charged with the knowledge of facts which would have been discovered by such an investigation (*Hobart* v. *Hobart Estate Co., supra* at pp. 440-442). The same principle has also been reaffirmed in professional negligence cases, the court holding that in actions for fiduciary malpractice the cause of action does not accrue until plaintiff discovers, *or should discover,* the negligence (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra* at p. 187). The court in *Moonie* likewise held that in a malpractice action against an accountant the statute of limitations does not run until the negligent act is discovered *or with reasonable diligence could have been discovered* (*Moonie* v. *Lynch, supra* at pp. 365-366; see to the same effect: *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 596 [83 Cal.Rptr. 418, 463 P.2d 770]).

We observe in passing that the language used in *Hobart*[11] contradicts rather than fosters appellant's position. It but reemphasizes that by showing actual discovery of facts within three years before bringing the action the statute of limitation for fraud may be overcome only if plaintiff had not been aware of those facts previously. On the foregoing basis the jury instructions given on the fiduciary relationship and the proof thereof[12] must be unhesitatingly sustained.

---

[11]The language in question reads as follows: "In the absence of a duty to make inquiry, as pointed out above, the statute does not run merely because the means of discovery were available, and plaintiff is not compelled to disprove that such means existed. He need only establish facts sufficient to show that he made an actual discovery of *hitherto unknown information* within three years before the filing of the action." (*Hobart* v. *Hobart Estate Co., supra* at p. 442; italics added.)

[12]The instructions at issue are:

"*The fact that a confidential,* fiduciary, or professional (such as an accountant and his client) *relationship exists does not excuse a party who has notice of facts from investigating those facts.* If he fails to pursue those facts of which he has notice, he is nevertheless held to have knowledge of each and every fact that he would have discovered had he pursued the facts he did have knowledge of." (Italics added.)

"Where there is a professional relationship, a plaintiff is not required to prove that in

■ Having determined the governing legal principles, we proceed to examine whether the limited partners and/or their agents knew of material facts prior to December 30, 1961, and December 30, 1962, respectively, which would have made a reasonably prudent person suspicious of respondents' wrongdoing, and would have put him on inquiry. A perusal of the record lends firm support to the conclusion that prior to the crucial dates the limited partners and their agents had been aware of numerous facts which singly and synergistically would have alerted a reasonable man to respondents' alleged wrongdoing.

Thus, a number of limited partners knew, or at least suspected, that there had been defalcations on the part of Grant and Ching. This knowledge formed the very basis of the lawsuit brought against Grant and Ching in 1960. Also, the limited partners and/or their agents knew that there had been several affiliated or controlled companies with which Grant and Ching entered into innumerable transactions; that the transactions were not made at arm's length; that Parkside's employees were being used in the affairs of the affiliates; and that the expenses of the affiliate companies were shown on Parkside's books.

There was also ample evidence that the limited partners or their agents were aware of facts which made them suspicious about respondents' role in Grant's and Ching's activities. Thus, prior to 1960, the limited partners complained that they had been unable to receive respondents' financial statements or reports which would have advised them of the substantial losses sustained by Parkside. Further, the limited partners' letters requesting financial statements had remained unanswered by respondents. More significantly, however, the investigation conducted on behalf of the limited partners by the accounting firm of Main-La Frentz and Company indicated that prior to 1960 there had been several irregularities with regard to the accounting services provided by respondents for Parkside. Mr. Wood, a general partner of Main-La Frentz and Company, testified that between 1954 and 1960 there were a number of

the exercise of reasonable diligence he could not have made an earlier discovery of facts which might give rise to a cause of action.

"Where there is such a relationship *a plaintiff must prove:* 1) *That he or his agents made the actual discovery of hitherto unknown facts* material to the statement of a cause of action or which on diligent inquiry would have lead [*sic*] to the discovery of facts material to the statement of a cause of action within the statutory period before filing the action; and 2) That prior to the commencement of the running of the statutory period neither he nor his agents had knowledge of any facts which would have put a reasonably prudent person acting under the same or similar circumstances upon an inquiry which, if pursued with reasonable diligence, would have led to the discovery of facts that might give rise to a cause of action." (Italics added.)

questionable items in Parkside's books; that respondents were "posting" the books of the client; that as of 1960 the accounting firm was concerned about the conflict of interest between Parkside and the associated companies; that problems arose concerning inadequate internal controls of Parkside[13] and respondents' independence; and that by 1961 Mr. Wood advised Attorney Kubby that it was amazing that a firm such as Logan and Frazer would have permitted the kind of things that went on there to go on.

But the circumstance that respondents had been suspected of wrongdoing prior to 1961 was brought home with even greater vigor by Attorney Kubby. In an attempt to remove respondents as accountants for Parkside and to have a receiver appointed, at the November 15, 1960, hearing in the *Chow* action Kubby accused respondents of either being fools or in cahoots with Grant and Ching, whom he thought were crooks, and repeatedly emphasized that as long as respondents were in charge of Parkside's accounting there was danger to his clients.[14] Kubby's suspicion was shared by co-counsel Shafton, who also entertained grievous doubts as to the propriety of respondents' activity, especially when the 1960 investigation uncovered that Mr. Moore, a partner of respondents' firm, purchased a piece of property from Grant and Ching.

Appellant's repeated argument that the action of the federal court prevented them from having a full discovery until 1965, and until that time they did not possess important books and documents (especially the books of the affiliated entities) from which respondents' wrongful

---

[13]The pertinent part of the record reads as follows: "Q In 1960, were you aware of potential problems in internal controls of Parkside Development relating to the checks, manner they wrote checks? A Yes. Q And you informed Mr. Kubby of that in 1960, did you not? A Yes. We found blank checks that were signed by the general partner in blank. In fact, we found a whole book of blank checks signed by a general partner. Q And also I think you testified earlier you were concerned about potential conflicts of interest in 1960? A Yes. Q And these were discussed with Mr. Kubby also? A Yes." .

[14]In illustration, we cite the following portions of the record: "Mr. Kubby: *They* [the accountants retained by counsel for the limited partners] *have said that Logan and Frazer are either fools or in with Grant and Ching* because nobody could set up a set of books and see all the things that are in those books without either resigning or making a report to Grant and Ching of what was going on." (Italics added.)

"Mr. Faulkner: . . . You make these outstanding accountants a bunch of thieves . . . . Mr. Kubby: We are prepared to go forward and if we have to and show what has gone on."

"Mr. Kubby: . . . *It is our thought that if these books are maintained in control of defendants and their accountants, Logan and Frazer, there is danger to our parties.* We feel that good, capable accountants should be employed and the books should be under the control of the administrator. *We don't care who it is as long as it's other than Logan and Frazer and the defendant.*" (Italics added.)

conduct could have been ascertained, is unavailing. Mr. Kubby admitted at the trial that the stay of discovery did not impede his own investigation and, in fact, he did investigate respondents in 1960-1961. Moreover, Parkside's expert, Mr. Wood, testified that he had full access to Parkside's books, had complete cooperation from respondents, and did not need the books of the affiliates unless he wanted 100 percent accuracy. In other words, access to the books of the affiliated companies would not have added significantly to the body of knowledge already available to him.

Appellant's assertion that Parkside did not have knowledge of respondents' possible lack of independence until 1967 is likewise contradicted by the record. The issue of respondents' independence began to surface in 1960 and was a question of concern for the limited partners. Mr. Wood admitted at trial that the statements made by Grant and Moore at the 1960 Honolulu meeting and the cross-examination of Moore in July 1962 raised the identical issue of independence. His testimony was corroborated by Mr. Kubby who, as mentioned before, conducted an independent investigation in 1960-1961 and concluded that respondents had not exercised due care; that under Securities and Exchange Commission standards they were not independent and that they had acted improperly.

Appellant's insistence that Attorney Kubby, who represented Parkside in the instant action, was coerced to testify and that his testimony was improperly received in evidence does not have any legal support. The criterion as to who may be called as a witness is whether the individual possesses personal knowledge concerning the matter as to which he testifies (Evid. Code, § 702). As amplified before, Kubby was an agent of the limited partners in the *Chow* action and possessed a great wealth of knowledge which had decisive significance in this case. Since Kubby was able to testify as to his personal knowledge, his testimony was not only relevant but also crucial as to the determination of the controversy.

Appellant's charge that the trial court committed prejudicial error by determining the relevancy and admissibility of numerous documents contained in the files of the *Chow* action by personal inspection is also entirely groundless. The record reveals that the trial court first requested counsel for both sides to enter into a stipulation with regard to the matter. When the parties were unable to reach any stipulation, the trial court followed the only sensible course available: he himself inspected the ponderous file amounting to tens of thousands of pages and

determined which part of it was relevant to the case at bench. It is, of course, axiomatic that the final determination of what evidence is admissible rests within the sound discretion of the trial court and its ruling will not be disturbed on appeal in the absence of showing clear abuse (Evid. Code, § 310; *Schomaker* v. *Provoo* (1950) 96 Cal.App.2d 738 [216 P.2d 562]).

In light of the legal conclusion reached above and the extremely strong record showing that Parkside was put on notice and was alerted by numerous facts of respondents' alleged wrongdoings well before the crucial 1961 and 1962 cut-off dates, the vast array of additional contentions becomes either entirely irrelevant or carries such slight weight as to be deserving of only relatively brief discussion.

■ Thus, the argument that the trial court abused its discretion by bifurcating the issue of statute of limitations from the remaining issues of the case is patently unfounded. Section 597 of the Code of Civil Procedure provides that when the answer pleads that the action is barred by the statute of limitations, the court may proceed to the trial of such special defense before the trial of any other issue in the case. As the cases explain, the objective of the bifurcation of the issues is avoidance of waste of time and money caused by the trial of issues which may be rendered moot—as was the case here (*Neff* v. *New York Life Ins. Co.* (1947) 30 Cal.2d 165, 175 [180 P.2d 900, 171 A.L.R. 563]; *Booth* v. *Bond* (1942) 56 Cal.App.2d 153, 156-157 [132 P.2d 520]). In the case at bench the affirmative defense of statute of limitations was pleaded in the answer, and in addition the cross-complaint showed on its face that the claims raised therein were barred by the statute of limitations. Under these circumstances the trial court was clearly justified in ordering a bifurcated trial of the issues.

■ Appellant's next contention that the trial court committed prejudicial error by denying its motion to amend the cross-complaint to conform to proof is equally untenable. While under section 473 of the Code of Civil Procedure and the case authorities pertaining thereto the trial court has wide discretion in allowing the amendment of any pleading (*Fortenberry* v. *Weber* (1971) 18 Cal.App.3d 213 [95 Cal.Rptr. 834]; *Hooper* v. *Romero* (1968) 262 Cal.App.2d 574 [68 Cal.Rptr. 749]; *Vick* v. *Grasser* (1959) 169 Cal.App.2d 692 [338 P.2d 223]), as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown (*Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 939 [119 Cal.Rptr. 82]; *Plummer* v.

*Superior Court* (1963) 212 Cal.App.2d 841, 843 [28 Cal.Rptr. 294]; 3 Witkin, Cal. Procedure (2d ed.) § 1040, p. 2619). As we pointed out in *Roemer*, in evaluating whether the trial court has properly exercised its discretion, a number of factors must be considered, including the conduct of the moving party and the belated presentation of the amendment (*Roemer* v. *Retail Credit Co., supra; Plummer* v. *Superior Court, supra*, at p. 844). While in the case at bench the cross-complaint was filed on August 12, 1969, appellant did not move to amend it until February 6, 1973, the fourth day of the trial, and even then it failed to offer any excuse for the tardiness of its application. The law is well settled that a long deferred presentation of the proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment (*Moss Estate Co.* v. *Adler* (1953) 41 Cal.2d 581, 586 [261 P.2d 732]).

Appellant's additional claim that the trial court committed a number of other errors in instructing the jury likewise does not call for detailed elaboration. Suffice it to say that a thorough review and analysis of the alleged instruction errors convinces us that considered as a whole the instructions given by the trial court correctly and accurately set out the applicable legal principles, were supported by evidence,[15] did not overemphasize respondents' theory of the case, and were not argumentative or unduly repetitive. We are also persuaded that the appellant's proposed instructions enumerated in its briefs were properly rejected because they were either legally incorrect or stated generalities or irrelevant matters or requested instructions on matters not in evidence. █ It requires special emphasis that the trial court was fully justified in refusing appellant's requested instructions on conspiracy. As underscored in cases, there is no cause of action for civil conspiracy itself. █ In any action based on civil conspiracy the statute of limitations is determined by the *nature* of the action in which the conspiracy is alleged (*Kenworthy* v. *Brown* (1967) 248 Cal.App.2d 298, 301 [56 Cal.Rptr. 461]; *Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 765 [343 P.2d 118]). █ In the case at bench appellant's cross-complaint purported to state causes of action for fraud and professional negligence, therefore the governing statutes of limitation were those set forth for fraud and professional malpractice. Furthermore, while the cases support the proposition that a cause of action based on civil conspiracy

---

[15]We note that contrary to appellant's assertion the phrase "and the limited partners and appointee who stood in the same position as a *general partner of plaintiff*" was not only legally correct but also supported by evidence. According to the record Scranton, a court appointee to Parkside, took the place of a general partner, signed checks for the limited partnership, and exercised a veto right over Grant and Ching.

accrues on the date of the commission of the last overt act in pursuance of the conspiracy (*Schessler* v. *Keck* (1954) 125 Cal.App.2d 827, 832-833 [271 P.2d 588]), it is imperative for the plaintiff to allege when the last overt act took place (*Agnew* v. *Parks, supra*). In the instant case it was alleged that the last act took place on September 14, 1960, which by itself was indicative that the respective statutes of limitation had already run at the time of filing the action in December 1964. Under these circumstances the giving of instructions on civil conspiracy would have been entirely meaningless and would have led only to confusion of the jury.

It is also totally unnecessary to expand on, or deal in minute detail with, other innumerable claims of error relative to the evidentiary rulings of the trial court. It is hornbook law that "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)

The cases point out that a miscarriage of justice should be declared only when the court, after the examination of the entire cause, including the evidence, is of the opinion that a result more favorable to the appealing party would have been reached in the absence of error or errors (*Reimel* v. *House* (1969) 268 Cal.App.2d 780 [74 Cal.Rptr. 345]; *Williams* v. *Lambert* (1962) 201 Cal.App.2d 115 [19 Cal.Rptr. 728]; *Neilsen* v. *Uyechi* (1959) 172 Cal.App.2d 508 [342 P.2d 329]). The review of the instant case, especially the overwhelming, if not conclusive, evidence supporting the jury verdicts convinces us that it is not reasonably probable that in the absence of the errors complained of a result more favorable to appellant would have been reached.

Lastly, we sharply reject appellant's contentions that the trial court displayed a series of prejudicial misconduct which, together with the totality of the alleged errors, denied appellant a fair trial. A thorough examination of the entire record demonstrates just the opposite, leading to the inescapable conviction that the trial court throughout the lengthy trial exhibited commendable skill, care and unquestionable fairness to both parties; that the issues were adjudicated upon correct jury instructions and properly received evidence; that the rulings of the trial

court strictly comported with legal principles; and that as an ultimate result appellant was accorded a full and fair trial.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied November 14, 1975, and appellants' petition for a hearing by the Supreme Court was denied December 11, 1975.