[Civ. No. 27989. First Dist., Div. Two. Feb. 25, 1972.]

LUELLA E. SCALLY, Individually and as Executrix, etc., et al.,
Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY,
Defendant and Respondent.

810

COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Sanford N. Gruskin, Assistant Attorney General, R. H. Connett, Deputy Attorney General, Cooley, Crowley, Gaither, Godward, Castro & Huddleson, Coben, Cooper & Zilaff, O'Gara & O'Gara, Paul A. Renne and James E. Harrison for Plaintiffs and Appellants.

F. T. Searls and Gilbert L. Harrick for Defendant and Respondent.

## OPINION

KANE, J.—In this negligence property damage action, the bifurcated issue of liability was resolved by jury verdict in favor of respondent Pacific Gas and Electric Company (hereafter P.G.&E.).[1] Plaintiffs appeal from the judgment entered upon that verdict, claiming prejudicial misconduct on the part of respondent's counsel during jury *voir dire* and error on the part of the trial court with respect to jury instructions.

About 2 p.m. on September 16, 1965 a fire broke out a short distance south of the City of Napa. The origin of the fire was traced to the area beneath the Vaca-Lakeville powerline owned, operated and maintained by respondent. The Vaca-Lakeville powerline consists of six 230,000 volt conductors running generally in an east-west direction. Immediately south of the southerly conductors in the area of the origin of fire there was a laurel tree. During the afternoon when the fire started, the Napa area was under the influence of a strong northerly wind, the vegetation was dry, and the temperature was in the high 80's.

Appellants advanced the theory that the fire was started by reason of contact between the laurel tree and the highly energized uninsulated conductor. In order to support the above theory, appellants introduced the following evidence: The origin of the fire was the right of way beneath the span of the powerline in the vicinity of the laurel tree. The right of way was not cleared of combustible material (grass, logs, debris, etc.). The state fire investigators, Mr. Van Dusen and Mr. Holbrook, observed on the same day that the bottom conductor on the south side of the powerline came in contact with one of the branches of the laurel tree while under the influence of the northerly wind. A photograph taken by Mr. Van Dusen on the same afternoon showed that the branch and the conductor were in close proximity under the force of wind. Respondent had not trimmed the trees along this powerline since 1957. The clearance between the tree and the conductor was only 8.63 feet in an at-rest position. Defoliated limbs from the north side of the tree (the side facing the powerline) contained localized burning and charring along the branches and at the tips. The Division of Forestry investigators could find no cause of fire other than the powerline. The expert testimony of Dr. Tilles pointed out that while contact between a 230,000 volt electric conductor and the laurel tree could start a fire in the branches of the tree, such contact would not necessarily leave a mark on the electric conductor, cause the circuit breakers to operate, result in a large, visible arc

---

[1]Eleven separate complaints filed by the respective plaintiffs were consolidated for trial. All plaintiffs, with the exception of the plaintiffs in civil action No. 24795, have appealed.

of electricity, nor necessarily cause substantial splitting of the wood or bark of the tree.

In rebuttal, respondent introduced evidence showing that there was no physical evidence of arcing between the limbs and the laurel tree. Its expert witnesses, Dr. Lewis and Mr. Collins, demonstrated that there cannot be electric arcing between a conductor and a tree limb without leaving distinctive evidence on the limb and conductor. Without arcing there would be no fire. Dr. Lewis also testified that if arcing between the conductor and limb had occurred, it would have continued until the circuit breakers would have deenergized the line which they did not do. The eyewitnesses (Mr. Van Dusen and Mr. Holbrook) saw no electric arcing, bright light or flash of fire, there was no sound, there were no falling leaves, debris or embers or other physically observable evidence to support a possible contact.

In ruling on a motion for a new trial the trial judge observed that the liability was very close with substantial evidence on both sides.

I. *Respondent's reference to insurance companies on voir dire examination did not constitute prejudicial misconduct.*

The record discloses the following colloquy between respondent's counsel and the first prospective juror: "MR. THISSELL: Mr. Mead, do you own any stock in a Northwestern Mutual Insurance Company? JUROR MEAD: No. MR. THISSELL: Have you ever worked for this Company? JUROR MEAD: No. MR. THISSELL: Aetna Insurance Company? JUROR MEAD: No. MR. THISSELL: Did you ever own stock or work for them? JUROR MEAD: No. MR. THISSELL: The Reliance Insurance Company? JUROR MEAD: No. MR. THISSELL: The Grenals Insurance Company? JUROR MEAD: No. MR. THISSELL: The Aetna Life and Casualty? JUROR MEAD: No. MR. THISSELL: The Travelers Insurance Indemnity Company? JUROR MEAD: No. MR. THISSELL: The Safeco Insurance Company? JUROR MEAD: No. MR. THISSELL: Fireman's Fund Insurance Group? JUROR MEAD: No. MR. THISSELL: You say—you hesitate, did you own stock at one time in that company? JUROR MEAD: No, I never did, I heard they've—I thought I heard Farmers, my car is insured with Farmers Insurance. MR. THISSELL: *Well, I don't believe Farmers is involved in this but Fireman's Fund Insurance Group.*" (Italics added.)

Appellants objected to the above line of questioning and moved for mistrial which was denied. The court gave a curative instruction to the jury on its own motion, emphasizing that no insurance company was a party to the action and that the question of insurance was not related to the issue of liability. The court also admonished the prospective jurors that "the question asked as to whether any of the jurors had stock in certain insurance

companies . . . was an improper question when applied to certain specified plaintiffs." The court then specified those plaintiffs by name.

Appellants argue that this latter admonition of the trial court compounded the claimed error by conveying the idea that the plaintiffs not mentioned were in fact insured. They insist that in view of the closeness of the liability the two errors combined constitute a valid ground for reversal.

Evidence Code, section 1155,[2] is a codification of a long established rule that evidence that a party is insured is inadmissible to prove negligence.

Notwithstanding the logic and simplicity of the rule, a totally illogical and unnecessary circumvention was engrafted by case law whereby under the guise of jury *voir dire* "counsel may, in good faith, ask prospective jurors whether they are interested in a particular insurance company so long as the question does not unnecessarily convey the impression that defendant is in fact insured. [Citations.]" (*Hart* v. *Wielt* (1970) 4 Cal. App.3d 224, 230 [84 Cal.Rptr. 220].) To suggest that such a question can be asked without "telling" the jury that a party is in fact insured is naivete of the highest order. If lawsuits are not games (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266]), the appellate courts should not be distributors of toys with which counsel can play.

Any lawyer or judge who has observed and/or participated in jury *voir dire* knows that such questions are asked for one purpose only—to convey the impression that a party is insured.

The evolution of this charade is founded upon the wildest speculation, namely, that an affirmative reply from the prospective juror might lead to a challenge for cause based upon bias. But how would such an affirmative answer, standing alone, display bias? The simple fact is that it would not.

The fallacy of the speculation is immediately evident upon analysis of its rationale which goes like this: if a party is in fact insured and a prospective juror does own stock in an insurance company, that juror is ipso facto biased because a verdict against the insured party will adversely affect the profits of the insurance company in which the juror owns stock; and therefore the juror will be inclined to violate his oath and vote not on the merits of the case, but according to how the verdict might somehow affect the financial structure of an insurance company which in truth may very well not be the insurer of any party to the particular case.

The fallacy has apparently been recognized by bench and bar alike

---

[2]Evidence Code, section 1155: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible to prove negligence or other wrongdoing."

by reason of the absence of any questions regarding insurance in the recently adopted standards for examination of jurors in civil cases.[3] ■ We think it abundantly clear from the foregoing discussion that where an insurance company is not a party, it is improper to ask prospective jurors any questions about ownership of stock or other financial interest in insurance companies.

Here, it is readily apparent that respondent's counsel went even beyond the scope of heretofore permissible inquiry by suggesting "Well, I don't believe Farmers is involved in this but Firemen's Fund Insurance Group." This improper statement was compounded by the first part of the trial court's admonition, which inferentially further confirmed that some appellants whose names were not specifically mentioned were in fact insured. We conclude, however, that this error was not prejudicial and further that any error was cured by the court's later admonition.

■ Whether counsel's improper reference to insurance constitutes prejudicial misconduct in a closely balanced case which cannot be cured by the court's admonition (*Hoffman* v. *Brandt* (1966) 65 Cal.2d 549, 554 [55 Cal.Rptr. 417, 421 P.2d 425]; *Swift* v. *Winkler* (1957) 148 Cal.App.2d 927 [307 P.2d 666]; *Stevenson* v. *Link* (1954) 128 Cal.App.2d 564 [275 P.2d 782]; *Curtis* v. *McAuliffe* (1930) 106 Cal.App. 1 [288 P. 675]) is determined by the court's view of the overall record, taking into account inter alia the nature and seriousness of the remarks, the good faith of counsel, whether the misconduct consisted of a single utterance or repeated, persistent reiteration thereof, the judge's control of the trial and the probable likelihood of prejudicing the jury (*Hart* v. *Wielt, supra*, at p. 233; *Walling* v. *Kimball* (1941) 17 Cal.2d 364, 369-370 [110 P.2d 58]).

■ Here, the trial court found that respondent's counsel acted in good faith. The single act of misconduct was not repeated. This serves as a distinguishing feature from the cited cases where counsel displayed repetitive and flagrant misconduct in an attempt to bring the question of insurance improperly to the attention of the jury. (See *Hoffman* v. *Brandt; Stevenson* v. *Link; Curtis* v. *McAuliffe*, all *supra*.) Furthermore, the court below observed that the question of insurance was thoroughly buried and did not have any prejudicial effect upon the jury.

These findings of the trial judge were impliedly reaffirmed by his ruling denying appellants' motion for a new trial. ■ It is well established that determinations made by the trial court denying a motion for a new trial

[3]California Rules of Court, Appendix, Division I Standards of Judicial Administration Recommended by the Judicial Council, section 8(c), effective January 1, 1972.

are entitled to great weight on appeal and should not be disturbed unless plainly wrong (*Hatfield* v. *Levy Brothers* (1941) 18 Cal.2d 798, 813-814 [117 P.2d 841]; *Walling* v. *Kimball, supra*). This is so because the trial judge is in a much better position than the appellate court to observe the demeanor of the parties, to gauge any possible effect it might have had upon the jury, and to determine whether the verdict in a case is probably due wholly or in part to the alleged misconduct. (*Walling* v. *Kimball, supra,* at pp. 368-369.)

■ In addition, the court gave, at least in part, curative instructions to disregard the question of insurance. Finally, the jury returned a verdict against all eleven plaintiffs, four of whom were uninsured—a fact which the jury knew by reason of the trial judge's comment.

At oral argument appellants suggested that the verdict itself demonstrates that the jury found against all plaintiffs because of their knowledge that seven were insured. We think it highly unlikely and unrealistic, however, to believe that a jury, finding liability in favor of all plaintiffs, would decide that issue against all on the irrelevant question of insurance coverage as to only some. Rather, we believe that the verdict itself demonstrates that the "insurance bugaboo" (*Causey* v. *Cornelius* (1958) 164 Cal.App.2d 269, 275 [330 P.2d 468]) had no prejudicial effect upon the jury.

II. *Failure to give instruction on efficient insulation constituted harmless error.*

■ Appellants requested the following instruction: "Because of the danger involved, the exercise of ordinary care by those charged with the maintenance of wires and other facilities for transmitting electricity requires that efficient insulation be used and maintained *at all places where there is a probability of injury to persons or property* from contact with transmission lines and facilities *if not so insulated.*

"In installing, maintaining, and supervising electric transmission lines and facilities, caution commensurate with the existing danger is required." (Italics added.)

With the exception of the last paragraph, the court refused to give said instruction.

■ While an electric company is not under an absolute duty to insulate or make the wires safe in any particular manner, it does have a duty to make the wires safe under all the exigencies created by the surrounding circumstances (*Lozano* v. *Pacific Gas & Elec. Co.* (1945) 70 Cal.App.2d 415, 422 [161 P.2d 74]). The duty of an electric company is alternative,

i.e., either to insulate the wires or to so locate them to make them comparatively harmless (*Polk* v. *City of Los Angeles* (1945) 26 Cal.2d 519, 527 [159 P.2d 931]; *McCormick* v. *Great Western Power Co.* (1932) 214 Cal. 658, 663 [8 P.2d 145, 81 A.L.R. 678]).

The perusal of the language of the instruction (which, incidentally, is the same as BAJI (5th ed. 1969) No. § 3.42, formerly BAJI No. § 102 E (Rev.)) convinces us that there is neither conflict nor contradiction between the alternative duty imposed upon an electric company and the obligation expressed in the instruction. The instruction does not, as respondent contends, require the company to insulate under all circumstances. The duty of insulation would arise only if the company had failed to make its wires safe through other means available, e.g., placement at a greater height, and only if, due to such neglect, a *probability* of injury from contact with the wires thereby existed. We conclude, therefore, that the instruction as requested by appellants properly stated the existing law, and failure to instruct the jury thereon constituted error.

Respondent contends, however, that the instruction was properly rejected on the ground that there was no evidence to support it (*Burks* v. *Blackman* (1959) 52 Cal.2d 715, 719 [344 P.2d 301]). This contention is based on the expert testimony of Mr. Collins who unequivocally stated that the installation of 230,000-volt overhead conductors is neither practicable nor customary.

Respondent's argument is mistaken for two reasons. First: The law is well settled that conformity to general custom of power companies with relation to the manner of maintaining powerlines does not excuse a defendant from liability unless that practice is consistent with due care under the circumstances (*Polk* v. *City of Los Angeles, supra,* at p. 529; *Lozano* v. *Pacific Gas & Elec. Co., supra,* at pp. 425-427). Similarly, where a duty to insulate exists, the factor of expense or inconvenience will not excuse compliance with the duty (*Arkansas Power & Light Co.* v. *Cates* (1930) 180 Ark. 1003 [24 S.W.2d 846]; 1 Joyce on Electricity, 735). Second: The evidence supporting the jury instruction had to relate to the probability of injury to persons or property from the contact with the conductor, not to the expense or practicability of an efficient installation. However, we do not consider the failure to give this instruction of prejudicial magnitude.

It is obvious that respondent's failure to insulate its wires did not constitute actionable negligence in the absence of proof of contact between the powerline and the tree. Had the jury found such a contact, respondent's liability would have been established under a number of other instructions

which prescribed for respondent a duty to prevent trees and vegetation from growing close enough to the wires, to inspect its powerline, to anticipate and guard against weather, including wind, and to keep the statutory clearance of 10 feet. In the light of these instructions, it is apparent that the verdict in favor of respondent indicates that the jury did not believe that the fire resulted from any contact between the tree and conductor.

### III. *No independent duty is imposed upon an electric company to keep its right of way clear of combustible material.*

Appellants' next assigned error is that the trial court refused to give a so-called "denudation" instruction although the evidence clearly established that the right of way of respondent's powerline was not cleared of inflammable vegetation and material and constituted a fire hazard.

The instruction requested by appellants read as follows: "The duty of safe maintenance of electrical facilities includes keeping the right of way clear of combustible vegetation and materials which are likely to be ignited from operation of those facilities and cause fire to be transmitted outside the right of way."

Appellants' position is seemingly supported by certain case authority which imposes upon property owners an independent duty to prevent the accumulation of inflammable materials on their premises; and in case of violation of this duty they are liable for damages even if the fire was caused by a third person (*Reid & Sibell* v. *Gilmore & Edwards Co.* (1955) 134 Cal.App.2d 60 [285 P.2d 364]; *Arneil* v. *Schnitzer* (1944) 173 Ore. 179 [144 P.2d 707]; see also case citations in 18 A.L.R.2d at p. 1095 et seq.). It is not difficult to discern, however, that these rules are not readily adaptable to electric companies whose powerlines are located on nonexclusive, right of way easements over which they have only partial control. Apposite, by analogy, are the railroad cases which clearly hold that no independent liability exists to keep the right of way free from combustible material; and that a railroad company is liable for failing to use due care to keep its right of way clear of inflammable material only if the cause of the fire was due to some other act or omission of the defendant itself, such as sparks from a locomotive (*Kansas City Southern Railway Company* v. *Beaty,* 239 Ark. 187 [388 S.W.2d 79]; *Louisville & Nashville Railroad Company* v. *Turner* (1964) 379 S.W.2d 749). *Irelan-Yuba etc. Min. Co.* v. *Pacific G.&E.* (1941) 18 Cal.2d 557 [116 P.2d 611] referred to by appellants is in accord with the above rule. In that case the court found defendant liable because the fire which ignited the combustible material on the right of way was caused by the contact of a falling tree with the electric wire.

The *Irelan* court predicated liability not simply upon an independent duty to keep the right of way clear, but rather upon a combination of that condition and a failure of the defendant to properly inspect its line. The crux of the matter is stated in *Irelan* at page 565: "It is not unreasonable to require appellant to anticipate that with high winds usually blowing in the vicinity in which the fire occurred, the tree might fall across and break one of the wires. Under the circumstances here presented, appellant was bound to anticipate the existence of a wind even of high velocity where such winds were not unusual. (*Rocca* v. *Tuolumne County Elec. etc. Co.,* 76 Cal.App. 569 [245 Pac. 468].) It should anticipate that once a wire did break the probabilities would indicate that a short circuit would result in igniting the combustible material such as grass and brush which it permitted to accumulate and remain on the right of way."

In addition, the duty of P.G.&E. with respect to maintenance of its right of way was amply covered by the following instruction which was given: "The duty of safe design, construction, operation and maintenance of electrical facilities and rights of way also includes preventing trees and other vegetation from growing close enough to electrical transmission lines to create a danger of their coming in contact with the line and causing a fire." Consequently, we hold that the court correctly refused to give the "denudation" instruction.

IV. *Refusal to give instruction on prima facie evidence of negligence was proper.*

■ Appellants next assert that refusal to give their requested instruction on prima facie evidence of negligence based upon Public Resources Code, section 4161.5, constituted prejudicial error. Their proposed instruction provided as follows: "At the time of the fire involved in this case, section 4161.5 of the Public Resources Code provided in pertinent part as follows:

" 'If any fire originates from the operation or use of any engine, machine, barbecue, incinerator, railroad rolling stock, chimney, *or any other device which may kindle a fire,* the occurrence of the fire [as a proximate result of such cause] is prima facie evidence of negligence in the maintenance, operation, or use of such engine, machine, barbecue, incinerator, railroad rolling stock, chimney, or other device. . . .' " (Italics added.)

The essence of appellants' contention is that the emphasized portion of the instruction includes electric transmission lines. We disagree.

In interpreting a statute or a part of it, we look first to the legislative

intent expressed. In the absence of any manifestation of such intent, we must apply general rules of statutory interpretation.

In the present case no evidence of legislative intent has been presented or found. ■■■ The rule of construction which governs us is the doctrine of *ejusdem generis* (also known as Lord Tenterden's rule) which states that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage. The words "other" or "any other" following an enumeration of particular classes should be read therefore as *other such like* and to include only others *of like kind or character* (*People* v. *McKean* (1925) 76 Cal.App. 114, 118-122 [243 P. 898]; *Pasadena University* v. *Los Angeles Co.* (1923) 190 Cal. 786, 790 [214 P. 868]). Accordingly, in *La Guardia* v. *City of New York* (1960) 22 Misc.2d 232 [198 N.Y.S.2d 230] the court interpreted "or any other device" as related to devices of a character similar to those specifically enumerated in the language preceding those words (pp. 232-233).

■■■ It seems obvious that the particular things mentioned in section 4161.5 of the Public Resources Code have certain common characteristics that the electric transmission lines do not have. Engines, machines, barbecues, incinerators, railroad rolling stock and chimneys emit sparks, fire or flames and in their ordinary use constitute a fire hazard, whereas an electric powerline in its ordinary operation does not possess any of these features.

Therefore, we conclude that under the rule of *ejusdem generis* respondent's electric transmission line is not included within the scope of Public Resources Code, section 4161.5. Accordingly, the instruction was properly refused.

V. *The trial court erred by giving a modified conditional res ipsa loquitur instruction.*

■■■ During the conference on instructions, appellants requested that the court give a mandatory res ipsa loquitur instruction. The court denied that request and gave the following modified conditional res ipsa instruction:

"Plaintiff claims there was an accidental occurrence; *to wit, a fire result-*

*ing from contact between D's 230 KV line and a tree limb;*[4] defendant denies it. If, and only in the event, you should find that as claimed by plaintiff, there was an accidental occurrence (~~and plaintiff was injured thereby~~) then (~~you are instructed as follows~~) it will be your further duty to determine whether the accident (~~injury~~) involved occurred under the following conditions:

"First, that it is the kind of accident (injury) which ordinarily does not occur in the absence of someone's negligence and

"Second, that it was caused by an agency or instrumentality in the exclusive control of the defendant (originally, and which was not mishandled ~~or otherwise changed after defendant relinquished control~~); and

"~~Third, that the accident (injury) was not due to any voluntary action or contribution on the part of the plaintiff, which was the responsible cause of his injury.~~

"If, and only in the event that you should find all these conditions to exist, you are instructed as follows . . . ." (Italics added.)

 Before the doctrine of res ipsa loquitur may be applied, the following three conditions must be met: (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 823 [291 P.2d 915, 53 A.L.R.2d 124]; *Wolfsmith* v. *Marsh* (1959) 51 Cal.2d 832, 835 [337 P.2d 70, 82 A.L.R.2d 1257]). The existence of these conditions is usually a question of fact (*Seneris* v. *Haas, supra* at p. 827). Where there is no issue of fact as to the existence of any of the requisite conditions, the application of res ipsa is compelled as a matter of law and the court is called upon to direct the jury to draw the inference of negligence (*Roddiscraft, Inc.* v. *Skelton Logging Co.* (1963) 212 Cal.App.2d 784, 794 [28 Cal.Rptr. 277]; *Di Mare* v. *Cresci* (1962) 58 Cal.2d 292, 300 [23 Cal.Rptr. 772, 373 P.2d 860]).

 Applying the above principles to the instant case, it seems evident that not only the lack of contributory negligence on appellants' part was established as a matter of law but also the first and second requirements. It can hardly be doubted that if the accidental occurrence (to wit: the fire) resulted from contact between respondent's powerline and the tree limb, someone had to be negligent either by failing to keep the statutory clearance of 10 feet (Pub. Resources Code, § 4107 (now 4293)), or,

---

4The italicized portion was added by the court to appellants' requested conditional res ipsa instruction.

in the alternative, by failing to insulate the wire. The purpose of the exclusive control requirement is to eliminate the possibility that the accident was caused by someone other than defendant. In other words, the control condition is merely to aid the court in determining whether it is more probable than not that the accident was caused by defendant's negligence (*Borenkraut* v. *Whitten* (1961) 56 Cal.2d 538, 547-548 [15 Cal.Rptr. 635, 364 P.2d 467]). Therefore, only where there is evidence indicating an equal probability that the accident was caused by defendant or a third person does this condition become a jury question. (Cf. *Roddiscraft, Inc.* v. *Skelton Logging Co., supra,* at p. 798.) Since in the instant case the jury had to find that the fire was caused by contact between the powerline and the tree, in order that the res ipsa doctrine be applicable at all, the probability that it was originated by some other means, was ipso facto excluded. Therefore, if the plaintiffs' hypothesis, i.e., contact, was proved, a mandatory res ipsa instruction should have followed and giving a conditional res ipsa instruction instead, constituted error, albeit nonprejudicial.

 It is hornbook law that a judgment will not be set aside on the ground of misdirection of the jury unless it has resulted in a miscarriage of justice (Cal. Const., art. VI, § 13; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 289). A miscarriage of justice justifying reversal occurs only when it appears reasonably probable that but for the error a more favorable result to appellant could have been obtained (*Williams* v. *Lambert* (1962) 201 Cal.App.2d 115 [19 Cal.Rptr. 728]; *Neilsen* v. *Uyechi* (1959) 172 Cal.App.2d 508 [342 P.2d 329]).

 The erroneous conditional res ipsa instruction could not have caused a miscarriage of justice. If the jury had found that the fire was the result of contact between the powerline and the laurel tree, it is rather improbable, if not impossible, that it would have reached a different result even if it had been instructed on res ipsa loquitur as a matter of law.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.