# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| S.A., a minor, by her father | : |
| H.O. | : |
| | : No. 1590 C.D. 2016 |
| v. | : |
| | : Argued: April 4, 2017 |
| Pittsburgh Public School District, | : |
| Appellant | : |

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MICHAEL H. WOJCIK, Judge

OPINION BY
JUDGE McCULLOUGH                                    FILED: May 1, 2017

Pittsburgh Public School District (District) appeals from the August 29, 2016 order of the Court of Common Pleas of Allegheny County (trial court) granting the appeal of S.A. and reversing the decision of the Board of Directors for the District (Board) to expel her from school for a period of one year. The discrete issue presented on appeal is whether a sharpened pencil constitutes a "weapon" as that term is defined by Rule #6 of the District's Code of Student Conduct (Rule #6). We conclude that it does not and affirm. The basis for our decision is that a pencil is not remotely comparable to the items expressly enumerated as a "weapon" in Rule #6, namely a "knife, cutting instrument, cutting tool, explosive, mace, nunchaku, firearm, shotgun, [or] rifle,"[1] and therefore does not fit within the prohibitory class of objects.

---

[1] Reproduced Record (R.R.) at 95a.

**Facts/Procedural History**

At the time of the incident in question, S.A. was a 14-year-old student in the 10th grade at Barack Obama International Academy in Pittsburgh. On May 9, 2016, S.A. was sitting in class when a student threw a cap to a cologne bottle at her, and S.A. retrieved the cap from the floor. The student who threw the cap was not the owner of the cologne bottle. The student who owned the cologne bottle approached S.A. and attempted to retrieve the cap, but S.A. refused to return it. After the student repeated his requests that the cap be returned, S.A. stated that if he continued his requests, she would stab him with her pencil. Thereafter, S.A. stabbed the student multiple times in the neck with a sharpened pencil. The victim sustained injures to the side and back of his neck, was treated by the school nurse (apparently with gauze pad coverings), and left school for the day. The nurse stated that the injuries could have been much worse if the pencil point had punctured one of the student's arteries. (R.R. at 34a, 42a, 63a, 72a-73a 138a-40a.)

The School District charged S.A. with violating Rule #6, which is modeled after and required by subsections 1317.2(a), (b), and (g) of the Public School Code of 1949 (School Code).[2] In pertinent part, Rule #6 provides:

---

[2] Act of March 10, 1949, P.L. 30, *as amended, added by* Section 4 of the Act of June 30, 1995, P.L. 220, *as amended,* 24 P.S. §13-1317.2(a)-(b), (g). Subsections (a) and (b) provide:

> (a) Except as otherwise provided in this section, a school district or area vocational-technical school shall expel, for a period of not less than one year, any student who is determined to have brought onto or is in possession of a weapon on any school property, any school-sponsored activity or any public conveyance providing transportation to a school or school-sponsored activity.

> (b) Every school district and area vocational-technical school shall develop a written policy regarding expulsions for possession of a

**(Footnote continued on next page…)**

2

6. WEAPONS AND DANGEROUS INSTRUMENTS:

A student shall not possess, handle or transmit a weapon while on any school property, while at any school-sponsored or approved activity or while walking or being transported in any manner to or from a school or school-sponsored or approved activity.

The term "weapon," as used in this Code of Student Conduct shall include but shall not be limited to any knife, cutting instrument, cutting tool, explosive, mace, nunchaku, firearm, shotgun, rifle and any other tool, instrument or implement capable of inflicting serious bodily injury . . . .

(R.R. at 95a.)[3] Rule #6 further states that a student who violates it will be expelled for one year and vests the Superintendent with discretion to recommend a less severe discipline on a case-by-case basis. *Id.*

---

**(continued…)**

weapon as required under this section. Expulsions shall be conducted pursuant to all applicable regulations.

24 P.S. §13-1317.2(a)-(b). As noted below, subsection (g) sets forth a definition of "weapon."

[3] Except for Rule #6's inclusion of the terms "mace" and "explosives," section 1317.2(g) of the School Code contains a definition of weapon that is identical to the one in Rule #6: "As used in this section, the term 'weapon' shall include, but not be limited to, any knife, cutting instrument, cutting tool, nunchaku, firearm, shotgun, rifle and any other tool, instrument or implement capable of inflicting serious bodily injury." Act of March 10, 1949, P.L. 30, *as amended, added by* Section 4 of the Act of June 30, 1995, P.L. 220, *as amended,* 24 P.S. §13-1317.2(g).

Considering the School Code as a whole, it appears that a school district's written policy, at a minimum, must duplicate the pertinent statutory language defining a "weapon," and, if it does not, then the School Code may be an independent basis upon which to expel the student. *See generally Picone v. Bangor Area School District*, 936 A.2d 556 (Pa. Cmwlth. 2007).

**(Footnote continued on next page…)**

Following an informal hearing held on May 17, 2016, the District sent S.A. and her parent a notice of determination letter informing them that a formal disciplinary hearing would be scheduled. The Board subsequently appointed a hearing officer who convened a hearing on May 26, 2016.

At the hearing, the District presented evidence that the hearing officer found established the facts set forth above. In turn, S.A. claimed that she was instigated by the student attempting to retrieve the cap and that he touched her breasts and buttocks during a scuffle. (*See* R.R. at 127a.) In the course of the hearing, a mechanical error occurred and caused the recording device to stop recording and a complete transcript of the hearing is not available.[4]

On June 3, 2016, after considering the evidence, the hearing examiner issued a recommendation, concluding that S.A. violated Rule #6 and expelling her for a period of one year. At a meeting on June 22, 2016, the Board voted to expel S.A. for one year and rejected her request for discipline that was less severe. S.A. then filed an appeal to the trial court.

In addressing the merits of S.A.'s appeal, the trial court did not receive any additional evidence. By opinion and order dated August 29, 2016, the trial court reversed the Board, concluding that S.A. did not violate Rule #6. The trial court reasoned:

**(continued…)**

In any event, for our analytical and dispositional purposes, there is no meaningful distinction between the language in Rule #6 and section 1317.2(g) of the School Code and our reasoning and result apply to each equally.

[4] The parties do not suggest that this malfunction impedes our ability to conduct meaningful appellate review of the issue presented.

Inasmuch as the sole basis on which the District has proceeded is that of possession of a "weapon" . . . the Court is constrained to agree with counsel for S.A. that the District, rather than responding to the actual misbehavior, expelled the student for the possession of a weapon. Counsel for S.A. urges that . . . the principle of *ejusdem generis* ["of the same kind or class"] would preclude the result urged by the District. That principle states that an ambiguous word should be given a precise meaning that is consistent with the words around it. In this matter, the pertinent rule of conduct prohibits possession of a weapon and, by way of further precision, explains that the term weapon includes "any knife, cutting instrument, cutting tool, explosive, mace, nunchaku, firearm, shotgun, rifle and any other tool, instrument or implement capable of inflicting serious bodily injury."

Of course, an individual might deliberately utilize any object as an instrument of harm. Nonetheless, the scope of the rule cited by the District cannot reasonably be construed any more broadly than as a prohibition of possession by a student of weapons that are of the same kind as set forth in the list stated in the District's rule. In fact, because that rule is careful to list not merely "any knife" but also cutting instruments and cutting tools and not merely any "firearm," but also shotguns and rifles, it is apparent that the drafters of the rule were aware of the method by which to ensure a broadened scope of the prohibition of weapons. That there was an intent for that scope to encompass a pencil within the definition of weapons proscribed in [Rule #6] is not plausible and, certainly, would not have afforded notice to S.A. that possession of a pencil placed her at risk of expulsion.

(Trial court op. at 5.) This appeal ensued.[5]

---

[5] Our scope of review is limited to determining whether the trial court abused its discretion, committed an error of law, or violated constitutional rights. *In re Appeal of JAD*, 782 A.2d 1069, 1070 n.3 (Pa. Cmwlth. 2001).

## Arguments on Appeal

Before this Court, the District argues that the trial court misapplied the language of Rule #6 to the facts of this case. According to the District, a sharpened pencil, when used to stab and injure another student in the neck, qualifies as an implement capable of inflicting serious bodily injury. The District further contends that Rule #6 is not vague and that S.A. had sufficient notice that her conduct violated the rule.

In response, S.A. cites *Picone v. Bangor Area School District*, 936 A.2d 556 (Pa. Cmwlth. 2007), and asserts that Rule #6 governs the possession of certain objects and that neither intent nor the manner in which the object is used is relevant. S.A. also emphasizes the doctrine of *ejusdem generis*, pointing out that a pencil is not a firearm or a similar instrument that possesses the characteristics of a traditional weapon.

Alternatively, S.A. requests a remand for the trial court to dispose of issues that she raised but were not addressed by the trial court. S.A. also seeks a remand in order to ensure that there is a complete factual record for the trial court to address these arguments.

## Analysis

Presently, the issue on appeal requires this Court to interpret the definition of a "weapon" in Rule #6, which states that "[a] student shall not possess, handle or transmit a weapon" on school premises or during school activities. (R.R. at 95a.) More precisely, we must determine whether a sharpened pencil falls within the ambit of the following operative phrase: "The term 'weapon' . . . shall include but shall not be limited to any knife, cutting instrument, cutting tool, explosive, mace, nunchaku, firearm, shotgun, rifle and any other tool, instrument or implement capable of inflicting serious bodily injury." (R.R. at 95a.)

6

In interpreting language in the School Code that is nearly identical to Rule #6,[6] this Court, quoting a trial court's analysis, observed:

> In reviewing the definition of "weapon" in the School Code, it is clear that the [General Assembly] listed several items that are traditionally considered to be weapons and that can inflict serious bodily harm when used in the manner intended (knife, cutting instrument, cutting tool, nanchaku, firearm, shotgun, and rifle). The [General Assembly] then included the term "capable" in the catch-all language "any other tool, instrument or implement *capable* of inflicting serious bodily injury," suggesting the [General Assembly's] intent to include not only "other" items *designed* to inflict serious bodily injury, but also "other" items, that *even when used as intended,* can inflict serious bodily injury.

*Picone*, 936 A.2d 562 (emphasis in original; citation omitted.)

In *Picone*, the school district expelled a student for possession of an air pellet gun after the student shot the pellet gun at his girlfriend and a plastic pellet struck her on the thigh, causing a welt. This Court concluded that the pellet gun, although not one of the expressly enumerated items in the statute, was nonetheless a weapon because it was an instrument "*capable of inflicting serious injury to an eye*." *Id.* (emphasis added.) Critically, in arriving at this holding, we disavowed the student's argument that the surrounding circumstances and his state-of-mind should be considered when determining if an object is a "weapon." Specifically, we stated: "While Student may have not intended to harm his girlfriend when he fired the pellet gun in her direction . . . a pellet gun *is intended to shoot plastic pellets at a relatively high velocity* and is capable of causing serious bodily injury." *Id.* (emphasis added.)

In our view, the principle to be extracted from *Picone* is that, when deciding whether an object is a weapon, the inquiry must focus solely on the object in

---

[6] *See supra* n.3.

7

isolation (in a vacuum so to speak) and its inherent operational capabilities; that is, what the object is intended to do in the practical and functional sense. Notably, the analysis does not take into consideration external factors, such as the manner in which the object was used by the student or the severity of the actual injury inflicted on the victim. In point of fact, even though the student in *Picone* shot his girlfriend with a plastic pellet in the leg and she suffered a relatively minor injury, this Court deemed the pellet gun to be a weapon because, from a purely objective standpoint dissociated from the facts of the case, a pellet gun is capable of causing serious bodily injury when a pellet shot with a notable amount of velocity punctures an eye.

Consequently, under *Picone*, it is the object, standing alone and in and of itself, and not the conduct of the person using the object, that determines whether an object is a weapon. This reading of *Picone* is in full accord with the language of Rule #6. After all, Rule #6 prohibits the mere "possession" of a "weapon" and defines what a "weapon" is. Tellingly, the rule does not contain any language defining a "weapon" in relation to, or depending upon, the specifics of how an object – or any kind of object for that matter – is utilized by the person wielding it. In other words, a weapon is self-defined as a weapon for purposes of Rule #6, and the manner in which a person uses an object cannot convert an otherwise non-weapon into a weapon.

Theoretically, almost any item or object that is of notable weight or has sharp edges possesses the capability of inflicting serious bodily injury. For instance, a paper clip that is bent or even a ruler if applied with extreme force could puncture a major artery and a heavy dictionary could cause blunt trauma to the head resulting in a hematoma. But a paper clip, ruler, and a dictionary are not *intended* to be used in this manner – their inherent and functional purposes in the schoolroom setting are to fasten papers, measure distance, and provide definitions to words. On a qualitative

8

level, then, a paper clip, ruler, and dictionary are very much different from a pellet gun, which is designed and intended to shoot projectiles. From another vantage point, the items expressly listed in Rule #6 as weapons may be used lawfully and not as a weapon; e.g., a knife may be employed to dice food, a cutting tool to open cardboard boxes, and a rifle to shoot clay discs. But when a student brings these items onto the school premises, they are assuredly not used for such purposes and are rightfully designated as weapons per se – or "traditional" weapons as the *Picone* court put it – under Rule #6.

From all of this, an apparent dichotomy emerges between what can be dubbed traditional and non-traditional weapons and the question becomes whether and/or where to draw a line.

"The ancient maxim '*noscitur a sociis*' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep." *Commonwealth ex rel. Fisher v. Philip Morris, Inc.*, 4 A.3d 749, 756 n.9 (Pa. Cmwlth. 2010). The principle of *noscitur a sociis* is applied to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of the [General Assembly]." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Pursuant to this rule, "the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it." *Ford Motor Company v. Unemployment Compensation Board of Review*, 79 A.2d 121, 123 (Pa. Super. 1951).

A related concept is that of *ejusdem generis*. "Under [the] doctrine *ejusdem generis* ('of the same kind or class'), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class

9

as those enumerated." *McClellan v. Health Maintenance Organization of Pennsylvania*, 686 A.2d 801, 806 (Pa. 1996). Stated in somewhat repetitive yet different language, the rule of *ejusdem generis* instructs that "where general words follow an enumeration of . . . words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to . . . the same general kind or class as those specifically mentioned." *Steele v. Statesman Insurance Company*, 607 A.2d 742, 743 (Pa. 1992). This maxim is codified conceptually in section 1903(b) of the Statutory Construction Act, which provides: "General words shall be construed to take their meanings and be restricted by preceding particular words." 1 Pa.C.S. §1903(b).

Upon review, we conclude that the doctrine of *ejusdem generis* carries the day here and dictates the result. In its first clause, Rule #6 enumerates a particular list of items ("knife, cutting instrument, cutting tool, explosive, mace, nunchaku, firearm, shotgun, rifle") and then sets forth in its second clause general items that parallel, in a broader way, those previously mentioned items ("and any other tool, instrument or implement capable of inflicting serious bodily injury"). Significantly, the phrase "any other" is situated between Rule #6's specific and general clauses, which strongly advises that an *ejusdem generis* construction is warranted to limit the meaning of the general and broad words located in the second clause to the nature and kind of the words in the first clause. *See also People v. Davis*, 766 N.E.2d 641, 645 (Ill. 2002) ("The doctrine of *ejusdem generis* provides that when a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the word 'other' is interpreted as meaning 'other such like.'"); *Scally v. Pacific Gas & Electric Co.*, 23 Cal. App. 3d 806, 819 (Cal. Ct. App., First Dist., 1972) ("The words 'other' or 'any other' following an enumeration

10

of particular classes should be read therefore as *other such like* and to include only others *of like kind or character.*") (emphasis in original).

For example, in *Hoy v. Angelone,* 720 A.2d 745 (Pa. 1998), the Supreme Court determined whether punitive damages fell within the "any other" portion of this statutory language from the Human Relations Act:[7]  "[T]he court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employes, granting of back pay, or *any other* legal or equitable relief as the court deems appropriate."  *Id.* at 748 (emphasis added; citation omitted).  Ultimately, the Supreme Court applied *ejusdem generis* and concluded that punitive damages did not belong to the enumerated class of relief:

> Central to the Act is the mission to make persons whole for injuries suffered as a result of discrimination. Likewise, the examples of appropriate remedies offered by the statute are make-whole measures, i.e., reinstatement, hiring, and back pay.  We believe that in the context of this statute, "affirmative action" is that action which serves to achieve the remedial goals of the Act. Thus, as used in the Act, affirmative action contemplates make whole measures and remedial action.
>
> Punitive damages are not consistent with this goal of achieving the remedial purposes of the statute and are not a make-whole remedy.  Punitive damages are not awarded as an additional compensation but are purely penal in nature. As punitive damages are based on a defendant's culpability, they are inconsistent with redressing injury.  While punitive damages also serve to deter, simply put, we do not consider punitive damages to be consistent with the remedial nature of the Act.  We believe that when interpreted in the context

---

[7] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§851-963.

11

of contemplated affirmative action, the phrase "any other legal or equitable relief" does not include punitive damages.

*Id.* at 749-50 (citations omitted).  In terms of grammatical structure and phraseology, the language at issue in *Hoy* is materially indistinguishable from that present in Rule #6.

A *ejusdem generis* construction is particularly necessary here, because if it were not applied, there would be no need for the drafters to include the particular, enumerated weapons in Rule #6, and this language would be rendered superfluous. To give effect to the verbiage comprising the listed and specified weapons, these weapons must be considered as shedding light upon – and informing our understanding of – the objects cataloged in the second clause as the "any other" weapons. *See Commonwealth v. Gilmour Manufacturing Co.*, 822 A.2d 676, 679 (Pa. 2003) (stating that a "bedrock principle of statutory construction requires that a statute be construed, if possible, to give effect to all its provisions, so that no provision is mere surplusage.") (citation and internal quotation marks omitted).  The end result is that the two clauses constituting Rule #6 must be read in tandem and viewed, essentially, as a collective whole.

Applying the interpretive doctrine of *ejusdem generis* to Rule #6, we construe the terms "tool," "instrument," and "implement" with explicit reference to the particular words that precede it ("knife, cutting instrument, cutting tool, explosive, mace, nunchaku, firearm, shotgun, rifle"), all of which contain a metal blade, discharge projectiles, or are otherwise traditional weapons that serve no innocuous purpose when brought onto school grounds.  While the pellet gun in *Picone* can reasonably be viewed to resemble a "firearm" in that both discharge projectiles, it is plain that a pencil is not characteristic of and does not belong to the class of enumerated weapons.  In other words, regardless of whether a pencil with a

point is capable of inflicting serious bodily injury, a pencil is not a "tool," "instrument," or "implement" for purposes of Rule #6 because these terms are restricted in scope and meaning to only those objects that are similar or comparable to the expressly-listed traditional weapons. *See Steele*, 607 A.2d at 743; 2A N. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION §47.17 (1991) (stating that "the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.").[8] Quite simply, a pencil is no such object and it is difficult to fathom how one could forcefully argue that it is. As a matter of common parlance, a pencil, instead, is an instrument whose intended, primary use in the schoolroom is for "writing, drawing, or marking," Webster's Third New International Dictionary, 1669 (Gove, ed. 1986), and we believe that any reasonable person looking at a pencil situated on a desk would not associate it with a "weapon," akin to a knife, rifle, or explosive.

In a statement that is not entirely clear, this Court in *Picone* seemingly suggested that certain items, including a pencil, are not weapons. We said: "Student argued that, if a 'weapon' is any object that is capable of inflicting serious bodily injury, then scissors, pencils, neckties, shoelaces, belts and jewelry are 'weapons;' however, students who possess such items are not expelled." *Id.* at 560 n.2. To the extent that our statement in *Picone* is ambiguous, as recommending that either a

---

[8] *See also State v. Hearns*, 961 So.2d 211, 219 (Fla. 2007) ("[T]he general phrase 'and any other felony'" . . . should be interpreted to include only offenses which [are] comparable to that of the enumerated felonies."); *Scally*, 23 Cal. App.3d at 818-19 (interpreting the end portion of statutory phrase, "If any fire originates from the operation or use of any engine, machine, barbecue, incinerator, railroad rolling stock, chimney, *or any other device which may kindle a fire*," to apply only to devices of a character similar to those specifically enumerated and concluding that an "electric powerline" does not fit within the class because the listed items "emit sparks, fire or flames and in their ordinary use constitute a fire hazard" while an electric powerline does not) (emphasis in original); *cf. People v. Craig*, 346 N.W.2d 66, 67-68 (Mich. Ct. App. 1983).

violation has not occurred or that a violation has taken place and discipline should not be imposed, we clarify it today and hold that a pencil is not a weapon for purposes of Rule #6 and also section 1317.2(g) of the School Code.

The above conclusion and the applicability of *ejusdem generis* to Rule #6 finds support by way of contrast to section 2301 of the Crimes Code, 18 Pa.C.S. §2301. This provision of the Crimes Code defines "deadly weapon" as follows:

> [a]ny firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, *or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.*

*Id.* (emphasis added.)

Unlike the language in Rule #6, which is required by and modeled after the School Code's definition of "weapon," section 2301 has verbiage (italicized above) that creates an entirely new and distinct class of weapons. In contrast to the two clauses in Rule #6, which must be read in reference to one another to truly understand the other, this new class in section 2301 is completely divorced from the preceding classes of weapons by independently bestowing on objects "deadly weapon status on the basis of their use under the circumstances." *Commonwealth v. Scullin*, 607 A.2d 750, 753 (Pa. Super. 1992). It is apparent, then, that the General Assembly knows how to define a weapon through a sub-set classification that encompasses each and every tangible object so long as a person uses that object in a manner that could cause serious bodily injury. However, in devising the term "weapon" in section 1317.2(g) of the School Code, the General Assembly chose not to include the language of section 2301, or language to that effect, nor did it amend the School

14

Code to insert such language.[9] It naturally and positively follows that the General Assembly did not intend the definition of "weapon" in the School Code, and the District's implementation of it vis-à-vis Rule #6, to be so broad as to cover every conceivable item that is capable of causing bodily harm. Instead, from these precepts, it can be inferred that the General Assembly most likely intended to limit the definition of "weapon" in the School Code and restrict the class of weapons to only those certain items that bear a fair resemblance to the enumerated weapons. Ultimately, this evidence of the General Assembly's intent further supports application of the *ejusdem generis* maxim and the conclusion that S.A. did not violate Rule #6.[10]

Finally, in ascertaining legislative intent, this Court must presume that the General Assembly does not intend an unreasonable or absurd result. *In re*

---

[9] On this note, the District's reliance on case law interpreting this statutory section and similar sections is severely misguided because every one of these cases evaluated the manner in which a person used a relatively innocuous object to inflict (or attempt to inflict) bodily harm on another person too. *See* the District's brief at 23-24 (citing, *inter alia*, *Commonwealth v. Roman*, 714 A.2d 440, 443 (Pa. Super. 1998) ("[A]n egg is not inherently dangerous, but the manner in which it was used made it a dangerous"); *Commonwealth v. Nichols*, 692 A.2d 181, 184-85 (Pa. Super. 1997) ("A baseball bat, when swung at the head, can be a very deadly weapon"); *Scullin*, 607 A.2d at 753 ("Although deadly weapons are commonly items which one would traditionally think of as dangerous (*e.g.,* guns, knives, etc.), there are instances when items which normally are not considered to be weapons can take on deadly status . . . . Although a tire iron is not traditionally deemed a deadly weapon, it is an instrument which is likely to produce death or serious bodily injury if used in a manner such as that used by appellee . . . . Thus, the tire iron used by appellee to strike the victim became a deadly weapon at the moment appellee threw it in the direction of the ultimate victim.")).

[10] *See also State v. Larson*, 365 P.3d 740, 744 (Wash. 2015) ("The statute plainly criminalizes *possession* of certain tools, not actual or intended use. If the legislature had intended to include use within the scope of the statute, it could have done so by including the word 'used' — as it did with other criminal statutes dealing with tools . . . . Had the legislature wanted to . . . criminalize intent to use a device to overcome a security system, it could have included specific language to that end.") (emphasis in original).

*Adoption of RBF*, 803 A.2d 1195, 1202 (Pa. 2002); *see* section 1922(1) of the Statutory Construction Act, 1 Pa.C.S. §1922(1). To be sure, "the first principle of statutory construction is that courts will not interpret legislative enactments in a manner which imputes absurdity to the legislative enactment." *Bowser v. Blom*, 807 A.2d 830, 835 (Pa. 2002) (citation omitted). As previously explained, under Rule #6, a student does not have to actually use a "weapon," but just possess or bring the weapon onto school property, in order to contravene the rule and be subjected to expulsion for one year. If this Court were to construe "weapon" to include the mere possession of a pencil, then a classroom full of students taking a multiple choice exam would all be in violation of Rule #6 and, eventually, there would be no students in attendance at the school. Obviously, this result is patently unreasonable and absurd. Because we can interpret Rule #6 in a way that avoids such a result, while still paying faithful homage to the rule's plain language, we will – or rather, must – do so pursuant to the principles of statutory interpretation.

Therefore, although S.A.'s conduct is reprehensible, the trial court was correct in concluding that S.A. did not possess a weapon, as that term is defined by Rule #6.[11]

## Conclusion

Presumably, the District could have disciplined S.A. for assault pursuant to some other rule in the District's Code of Student Conduct. Here, however, the District made a reach too far when it sought to expel S.A. for possessing a "weapon" under Rule #6. Based on the above analysis, different language is needed for Rule #6 to include a pencil within the definition of a weapon – language that is not related or

---

[11] Due to our disposition, we need not address S.A.'s other arguments.

made in reference to ("and any other") a preceding list of specific items that are not remotely comparable to a pencil. Accordingly, having determined that possession of a pencil is not equivalent to possession of a weapon and that S.A. did not run afoul of Rule #6, we affirm the trial court's order.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

S.A., a minor, by her father : 
H.O. : 
             :   No. 1590 C.D. 2016
           v. : 
             : 
Pittsburgh Public School District, : 
           Appellant : 

## ***ORDER***

AND NOW, this 1st day of May, 2017, the August 29, 2016 order of the Court of Common Pleas of Allegheny County is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge