Filed 7/28/23  Smith v. Barakat CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| JEFFREY SMITH et al.,<br><br> Cross-Complainants and Appellants,<br><br>  v.<br><br>SAMIR BARAKAT et al.,<br><br> Cross-Defendants and Respondents. | A165751<br><br><br>(Contra Costa County<br>Super. Ct. No. CIVMSC21-00151) |

Cross-complainants and appellants Jeffrey Smith and OnTheGo, Inc. (OTG) appeal following the trial court's order sustaining, without leave to amend, the demurrer of cross-defendants and respondents Samir Barakat and Barakat Consulting, Inc. (BCI) to Smith's third amended cross-complaint.  The underlying action concerns a 2012 agreement and addenda between Smith and Barakat in which Barakat agreed to provide consulting services and funding in exchange for a percentage of any amount Smith recovered in two qui tam cases in which Smith acted as the relator.  In 2021, BCI filed suit against Smith and his company OTG for breach of contract after Smith obtained a significant settlement in the qui tam cases but refused to pay Barakat.  Smith then cross-complained against Barakat for, among

other claims, fraud, breach of fiduciary duty, and elder abuse.  After two rounds of successful demurrers by Barakat and subsequent amendments by Smith to the cross-complaint, the trial court sustained Barakat's demurrer to the third amended cross-complaint without leave to amend on statute of limitations grounds.  The court held that Smith's causes of action against Barakat accrued by 2013 and that the allegations in the third amended cross-complaint still failed to show that Smith could not have discovered Barakat's alleged wrongdoing before 2014 to delay accrual.  We agree that Smith's claims are untimely and affirm.

## BACKGROUND

### 1. Facts

The following facts are taken from the third amended cross-complaint and its attached exhibits.  Smith is the founder and president of OTG, a company that provides wireless rate plan optimization services to private companies as well as to the government.  Based on his specialized knowledge, Smith discovered that many of the telecom companies were unlawfully overcharging government agencies.  In or around 2011, Smith retained counsel to represent OnTheGo Wireless, LLC (an entity Smith created for litigation purposes) as the relator in potential qui tam or whistleblower lawsuits against these telecom companies.[1]  In 2012, while the lawsuits were still being prepared, OTG was running low on cash and Smith was seeking a loan of $300,000 to $600,000 to meet OTG's payroll and business needs. Smith's counsel recommended that Smith reach out to Samir Barakat, a former client of Smith's counsel who was in the business of providing cash flow to people like Smith and had been a relator himself several years prior.

---

[1] Two qui tam lawsuits were subsequently filed in July and November 2012 in California and Nevada.

2

Smith met with Barakat in early June 2012. Barakat stated that he was in the business of providing loans and cash flow assistance to relators in qui tam actions. Barakat confirmed he would loan Smith $300,000 but that Smith would first need to enter into a temporary consulting agreement with BCI. Barakat represented that his consulting services helped increase the value of his clients' businesses by millions of dollars and that he could do the same for Smith's business in the span of a couple of years. Barakat further represented that he would help Smith expand his qui tam cases to other states and help Smith expand his business. Based on these representations and his need for a loan, Smith signed the consulting agreement on June 12, 2012. The agreement stated that Barakat would provide $150,000 worth of consulting services and bill for any services in excess of this amount at a rate of $450 an hour. In exchange, Barakat would be paid a percentage of any fee Smith earned in unspecified qui tam cases.[2]

Shortly after the agreement was signed, Barakat hired the law firm Hanson Bridgett to jointly represent Barakat and Smith and to provide legal services for Smith's benefit. On or around December 31, 2012, Smith received Hanson Bridgett's invoices for work performed from June to September 2012 which totaled $43,164. Smith alleges that he paid this amount in full (from the funds Barakat provided or loaned) and that he believed "those services were provided to him as the client and solely for his

---

[2] Specifically, the agreement provided that "[i]f OTG obtains a successful verdict or settlement in one or more qui tam cases, OTG will pay out of proceeds paid to or applied for the benefit of OTG an additional amount equal to the following: (a) 2 times the amount billed . . . plus (b) 8% of the first $20 Million of the qui tam relator revenues (net of attorney shares) and 2.5% of any amount above $20 Million."

benefit." The first page of each invoice named BCI and Barakat under "Client."

On July 24, 2012, Barakat provided Smith with an addendum to the consulting agreement stating that Barakat would provide $200,000 to Smith in exchange for a greater percentage of any recovery from the filed qui tam cases. Barakat would pay Smith $80,000 up front and the remaining $120,000 over time per a payment schedule to be later discussed. The addendum further stated that Barakat's interest in the qui tam cases would be increased to "12% of the first $20 Million in revenues and 6% of any amount above $20 Million." On August 12, 2012, Smith signed the addendum but added a notation that he assumed Barakat would still honor his agreement to fund Smith $300,000. Barakat did not ultimately fund this $300,000 amount.

In January 2013, Barakat provided Smith with a second addendum and told Smith he would wire another $10,000 after Smith signed it. This addendum stated that Barakat had provided consulting services worth $234,349, which included "approximately $40,000 of Fred Weil [of Hanson Bridgett]'s time" that Barakat had paid. The addendum further stated that, with the additional $10,000 in funding and $40,000 paid to Hanson Bridgett, Barakat had "funded $257,000 in total that is an increase of $57,000" over the $200,000 amount. The addendum increased Barakat's interest to "15.4% of the first $20 Million in revenues and 7.7% of any amount above $20 Million." After receiving the addendum, Smith asked Barakat about their "original deal" of $300,000 in funding. Barakat continued to make representations about the value he had delivered, the business opportunities he promised to develop, and that he "expect[ed] to be working closely with [Smith]" and would "like to be involved in overall strategy in dealing with

4

attorneys and case strategy" as he had less time for "data analysis or detail work."  Barakat also advised Smith not to share their deal with Smith's new attorneys as "they might want to reopen their deal with [Smith] as [Barakat's] deal could be seen as richer."  Relying on Barakat's representations, Smith signed the second addendum on January 8, 2013.

At the time Smith signed the second addendum, he "understood and expected Barakat and Hanson Bridgett would be providing him consulting and legal services through the conclusion of the qui tam case."   However, as soon as Smith signed this addendum in early January 2013, "Barakat and Hanson Bridgett both ceased doing any actual work for Smith" and Barakat "provided no consulting services with regard to corporate strategy, [or] expansion of Smith's business or class action lawsuits that generated any value."  Barakat also falsely led Smith to believe he would lend Smith at least $300,000 when Barakat had no intention to do so.  In sum, Smith alleged that after January 2013, "Barakat essentially abandoned Smith, where he performed little or no further consulting services under the contracts . . . and the remainder of the anticipated funding never materialized."

On September 4, 2020, Hanson Bridgett sent a letter to Smith's counsel demanding payment on behalf of Barakat from Smith's qui tam settlement proceeds.  Smith alleged that "[t]his letter was the first time that [he] was ever put on notice that Barakat had retained Hanson Bridgett's services in contravention of Smith's best interests."  The letter stated that Smith was expected to receive almost $31 million as his settlement share after attorneys' fees from the two qui tam cases.  The letter calculated Barakat's share of this to be approximately $6.7 million based on the parties' contracts, and noted Smith's position that he did not intend to convey this amount to Barakat.

5

### 2. *Cross-Complaint and Demurrers*

On January 25, 2021, BCI filed suit for breach of contract against Smith. The complaint seeks recovery of the $6.7 million amount based on the parties' June 12, 2012 consulting agreement, the first addendum, and the second addendum (collectively, contracts).

On March 19, 2021, Smith filed a verified cross-complaint against Barakat and BCI for fraud, breach of fiduciary duty, constructive fraud, unauthorized practice of law, and aiding and abetting Hanson Bridgett's breach of fiduciary duty. The cross-complaint sought unspecified compensatory damages. The cross-complaint also attached the contracts as exhibits.

Following counsel's meet and confer, Smith filed a verified first amended cross-complaint which alleged seven causes of action for rescission of the contracts based on: (1) fraud; (2) breach of fiduciary duty; (3) constructive fraud; (4) elder abuse; (5) unilateral mistake of fact; (6) material failure of consideration; and (7) illegality. The amended cross-complaint also alleged an eighth cause of action for declaratory relief.

####    a. *Demurrer to First Amended Cross-Complaint*

Barakat and BCI filed a demurrer to the first seven causes of action in the first amended cross-complaint, and requested judicial notice of the contracts, which the trial court granted.[3] The demurrer argued that the rescission-based causes of action were barred by the four-year statute of

---

[3] Smith argues that the trial court improperly took judicial notice of the contents of the contracts. We disagree. Smith did not oppose Barakat's request for judicial notice below and the third amended cross-complaint itself quotes the material terms of the contracts, including the percentages Barakat would receive from any qui tam settlements as agreed upon by the parties. For purposes of a demurrer, the facts pled in a complaint are accepted as true. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

6

limitations, that Smith waived the right to rescind through his delay, and that Smith failed to plead facts sufficient to state a cause of action with respect to his claim for rescission. Barakat and BCI also filed a motion to strike the first amended cross-complaint's request for compensatory damages based on the lack of allegations that Smith actually suffered any compensatory damages.

The trial court sustained the demurrer and granted the motion to strike, both with leave to amend. With respect to the demurrer, the court held that the causes of action were time-barred and that Smith failed to allege facts showing that the delayed discovery rule applied as explained in *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797 (*Fox*). Specifically, the court noted that *Fox* required that a plaintiff plead facts showing: "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." Based on the allegations that Barakat stopped providing services to Smith after January 2013, the court concluded, "it is hard to see what facts supporting a claim for rescission Smith did not have by January 2013, or certainly by the end of 2013 . . . . The only thing he did not know is that in 2020, Hanson Bridgett would claim it was never his attorney and never owed him any duties."

b. *Demurrer to Second Amended Cross-Complaint*

Smith's second amended cross-complaint changed the first four causes of action from rescission to direct claims for fraud, breach of fiduciary duty, constructive fraud, and elder abuse. The fifth, sixth, and seventh causes of action for rescission based on unliteral mistake, material failure of consideration, and illegality, remained unchanged. The pleading added numerous factual allegations regarding Barakat's retention of Hanson Bridgett and their failure to disclose to Smith that Barakat alone was

7

Hanson Bridgett's client. An allegation was also added that Smith could not have discovered Barakat's fraud earlier because "Barakat and Hanson Bridgett kept secret from Smith until September 2020 their true intention that Hanson Bridgett was only acting as Barakat's lawyers to advance Barakat's interests." Accordingly, Smith now alleged actual damages of $43,164 for the legal fees paid to Hanson Bridgett, as well as "legal fees Smith has incurred since September 2020 in responding to Hanson Bridgett's actions adverse to Smith's interests."

Barakat and BCI demurred on the grounds that the amended pleading failed to cure the defects noted in the trial court's order. The demurrer further argued that Smith's "new claim" that he was damaged in paying $43,000 to Hanson Bridgett was insufficient to overcome his prior allegations regarding actual or constructive knowledge of Barakat's wrongdoing and, moreover, was contradicted by Smith's prior pleading and the second addendum which stated that *Barakat*, not Smith, paid for Hanson Bridgett's legal fees.

The trial court sustained the demurrer with leave to amend as to the first, second, third, and fourth causes of action but sustained the demurrer without leave to amend as to the fifth, sixth, seventh, and eighth causes of action. The court held that Smith still failed to plead "facts to make clear that he did not suspect, had no reason to suspect, and could not have discovered that he had been injured by the pertinent misrepresentation more than four years before this lawsuit was filed." In response to Smith's contention that his cause of action did not accrue until his obligation to pay BCI's fee materialized in 2020, the court responded that "Smith's new tort claim is for damages, not for rescission, and the damages are the $43,000 paid to Hanson Bridgett" and "BCI paid the $43,000 for Smith by

8

January 2013." The court further noted that Hanson Bridgett's 2012 invoices, attached as an exhibit to the second amended cross-complaint, showed that its clients were BCI and Barakat.

The court prohibited Smith from amending to allege any new causes of action and provided detailed instructions as to what amendments were allowed. Specifically, Smith was permitted to amend to add the following: (1) the date Smith was first provided with Hanson Bridgett's invoice; (2) the date of Barakat's alleged misrepresentation concerning Hanson Bridgett's role; (3) how many days before June 12, 2012, Smith first communicated with Barakat; and (4) the date Barakat told Smith that Barakat had hired Hanson Bridgett to carry out the termination of one of Smith's qui tam counsel. The court justified limiting the scope of amendments on the ground that Smith's cross-complaint was unduly lengthy and repetitive.

c. *Demurrer to Third Amended Cross-Complaint*

The third amended cross-complaint added allegations that Smith first met with Barakat around June 5, 2012, that Barakat first represented to Smith that he had hired Hanson Bridgett to perform legal services for Smith "during the first three weeks of June 2012," and that Barakat provided Smith with Hanson Bridgett's invoices on or around December 31, 2012.

Barakat and BCI filed a third demurrer, which again argued that Smith's claim with respect to Hanson Bridgett's legal fees was time-barred and, even assuming it was not, failed to allege any damages since the prior pleadings made clear that Barakat paid these legal fees. The trial court sustained this demurrer without leave to amend. The court held that Smith's new allegations still failed to show that he "could not have discovered before 2014 that the representation about the identity of Hanson Bridgett's client was false had Smith exercised reasonable diligence." With respect to when

9

Smith's causes of action accrued, the court reasoned that while "Barakat could not have sued Smith for Barakat's contingent fee until the contingency was realized, [] the situation is not the same in reverse as to Smith's current claim for damages against Barakat" since the $43,000 was paid to Hanson Bridgett in 2012.

Smith timely appealed.

**DISCUSSION**

### 1. *Standard of Review*

We review an order sustaining a demurrer de novo and exercise our independent judgment as to whether the complaint states a cause of action as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) This extends "even as to matters not expressly ruled on by the trial court." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13.) We accept as true all material facts properly pled and matters which may be judicially noticed but disregard contentions, deductions, or conclusions of fact or law. (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.) We "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Id.* at p. 316.) "We may also take notice of exhibits attached to the complaints. If facts appearing in the exhibits contradict those alleged, the facts in the exhibits take precedence." (*Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447 (*Holland*).)

"In order to prevail on appeal from an order sustaining a demurrer, the appellant must affirmatively demonstrate error. Specifically, the appellant must show that the facts pleaded are sufficient to establish every element of a cause of action and overcome all legal grounds on which the trial court

10

sustained the demurrer." (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752.)

## 2. *Accrual and the Delayed Discovery Rule*

"In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred." (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403.)

In this case, Smith argues that, although he alleged Barakat stopped performing any services in 2013, the causes of action did not accrue until 2020 because he could not have discovered the claims earlier and because he did not incur damages until the qui tam actions settled in 2020. We briefly summarize the law concerning accrual of a cause of action and the delayed discovery rule before turning to the merits.

"The limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) A claim generally accrues at "the time when the cause of action is complete with all of its elements. An exception is the discovery rule, which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action, until, that is, he at least suspects, or has reason to suspect, a factual basis for its elements." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 389; Code of Civ. Proc., § 338, subd. (d) ["The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake"].)

Application of the discovery rule is not "hypertechnical" and "suspicion of one or more of the elements of a cause of action, coupled with knowledge of

11

any remaining elements, will generally trigger the statute of limitations period." (*Fox, supra*, 35 Cal.4th at p. 807.) In other words, "[r]ather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing injured them." (*Ibid.*) The discovery rule "does not encourage dilatory tactics." (*Ibid.*) "[P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation" (*id.* at p. 808).

"In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' [Citation.] In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' " (*Fox, supra,* 35 Cal.4th at p. 808.) While resolution of a statute of limitations issues is normally a question of fact, " 'whenever reasonable minds can draw only one conclusion from the evidence, the question becomes one of law.' [Citation.] Thus, when an appeal is taken from a judgment of dismissal following the sustention of a demurrer, 'the issue is whether the trial court could determine as a matter of law that failure to discover was due to failure to investigate or to act without diligence.' " (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1320.)

3. ***The Third Amended Cross-Complaint Fails to Plead Facts Showing Why Smith Was Unable to Discover Barakat's Wrongdoing Earlier.***

Smith argues he could not have discovered Barakat's fraud earlier than

2020 because he reasonably relied on Barakat's continued promises of adding value to Smith's business and of working closely with Smith through the conclusion of the qui tam actions. Accordingly, Smith contends that the delayed discovery rule applies in postponing the accrual of his causes of action, which were based on events that occurred in 2012 and 2013. We are unpersuaded.

     *A. Representations as to Barakat's Services and Funding.*

The third amended cross-complaint alleges that Smith, in the exercise of reasonable diligence, could not have discovered Barakat's fraud because "(1) Barakat and Hanson Bridgett kept secret from Smith until September 2020 their true intention that Hanson Bridgett was only acting as Barakat's lawyers . . . , and (2) the fact that Smith would have no potential obligations to make any payments to Barakat until October 2020, at the earliest, when he received his first qui tam settlement payment."

Initially, we note that the allegation that Smith did not discover that Hanson Bridgett was not his attorney until 2020 does not diminish the other allegations in the third amended cross-complaint which gave Smith reason to know or suspect wrongdoing on *Barakat's* part. The cross-complaint alleges that Barakat made several misrepresentations to Smith in 2012 and 2013, including that (1) Barakat would provide valuable consulting services in the qui tam actions and to Smith's company, OTG; (2) he would loan Smith at least $300,000 to $600,000 after the parties entered into the consulting agreement; and (3) Barakat had hired Hanson Bridgett to perform legal services on Smith's behalf.

First, the third amended cross-complaint is replete with allegations that as soon as Smith signed the second addendum in January 2013, Barakat and Hanson Bridgett both ceased doing any work for Smith, and Barakat

13

specifically stopped providing any further funding or services to Smith. While we accept as true the allegation that Smith trusted Barakat and relied on his purported expertise at that time, we do not accept Smith's conclusory allegation that he could not have, in the exercise of reasonable diligence, discovered the falsity of Barakat's representations until 2020. Barakat allegedly stopped assisting Smith entirely after January 2013 despite his earlier representation that the two would be "working closely." There are no allegations that Smith followed up with Barakat at all between February 2013 and September 2020, when Smith received Hanson Bridgett's demand letter, a span of more than *seven* years. Before 2017—four years before this action was filed—Smith certainly had reason to know or at least suspect that Barakat had made misrepresentations after he promised to provide valuable services and funding but allegedly did nothing for several years.

With respect to a cause of action in tort, "the discovery rule most frequently applies when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand." (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1248.) Although Smith alleges that Barakat concealed his intent to claim a portion of the settlement from the qui tam cases without making any real contribution to them, the pleading does not allege that Barakat attempted to hide or obscure this intent from discovery through any actions or representations after January 2013. Smith provides no facts to support a conclusion that the complete lack of work on Barakat's part after January 2013 was something that was not readily

14

observable and apparent for an ordinary person to understand.[4]  The third amended cross-complaint fails to allege facts showing that Smith could not have discovered Barakat's wrongdoing before 2017, or that he even made any investigation into Barakat's lack of effort at any time after January 2013.

Smith argues that he did investigate in January 2013 when he questioned Barakat regarding his funding promise.  Smith cites an email he sent Barakat that was attached as an exhibit to Smith's original cross-complaint.  The third amended cross-complaint does not attach the email but quotes a portion of it in which Smith questioned Barakat concerning their "original deal" for a loan of $300,000.  In response, Barakat allegedly "continued to make representations about qui tams he uncovered, the value he had delivered, and his on-going promise to develop business opportunities for Smith."  There are no allegations that Smith followed up regarding any additional funding pursuant to the parties' "original deal" at any point after January 2013.  Despite any other promises Barakat allegedly made, Smith still knew or at least had reason to suspect that Barakat did not intend to loan the full $300,000 to Smith before 2017.  Further, this single email exchange from January 2013 does not relieve Smith of a duty to conduct a reasonable investigation after Barakat stopped providing all services *after* Smith signed the second addendum in January 2013.  If Barakat made promises to develop business opportunities for Smith, for example, the absence of any activity for years thereafter should have prompted Smith to

---

[4] Smith argues the trial court erred in equating his allegation that Barakat "essentially abandoned Smith" with an allegation that Smith knew of this abandonment in 2013.  Even if the allegation of abandonment itself does not establish Smith's knowledge in 2013, the pleading as a whole shows that Smith had reason to suspect wrongdoing on Barakat's part after "Barakat basically stopped doing anything for Smith" after January 2013.

investigate further.

Finally, Smith argues that in analyzing Smith's duty to investigate, the trial court incorrectly applied a "hypothetical reasonable man" standard instead of the standard stated in *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240, which looks at whether " 'the conduct of the plaintiff in light of his own intelligence and information was manifestly unreasonable.' " (*Id*. at p. 1247.) However, as Smith himself concedes, *Alliance* did not involve issues of accrual or the delayed discovery rule. Rather, the quote in *Alliance* was in the context of explaining the element of justifiable reliance in a cause of action for fraud. It is therefore not particularly relevant to our analysis.

In terms of when a cause of action accrues, our Supreme Court held that the statute of limitations commences when a plaintiff has " 'notice or information of circumstances to put *a reasonable person* on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation.' " (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 101, italics added, italics in original omitted.) Indeed, even where the parties are in a fiduciary relationship, "once the plaintiff becomes aware of facts which would make a *reasonably prudent person* suspicious, the duty to investigate arises and the plaintiff may then be charged with the knowledge of facts which would have been discovered by such an investigation." (*Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 131, italics added.) Here, the allegations as to Barakat's complete lack of services and further funding after January 2013 are facts that would have put a reasonably prudent person on inquiry notice of the need at least to investigate the circumstances. Smith elected to do nothing for more than seven years until Barakat demanded a share of the qui tam settlement in 2020 and cannot now invoke the delayed discovery rule to save

16

his time-barred claims.

*B. Hanson Bridgett's Invoices.*[5]

Smith next contends that the trial court erred in imposing a duty on Smith to investigate Hanson Bridgett and in holding that Hanson Bridgett's invoices should have prompted Smith to investigate the identity of Hanson Bridgett's client earlier. The first page of each invoice identifies "Client" as "020230" and includes BCI and Barakat's names underneath it. Below that, it identifies the "Matter" as "020230.000003" with "EOnTheGo, Inc." next to it. The trial court held that "[a]t the very least, the invoices create an ambiguity about the identity of the client that a reasonable person would have investigated, especially when the [third amended cross-complaint] fails to allege that Smith had any contact with Hanson Bridgett for another *eight years*." We agree. While the invoices may not clearly indicate that Hanson Bridgett was not Smith's attorney, their identification of BCI and Barakat under "Client" should have at least prompted a reasonable person to investigate the issue further, especially since Smith also alleged that Hanson Bridgett "ceased doing any actual work for Smith" after the second addendum was signed, despite its promises "to support Smith through the conclusion of his qui tam cases."

Smith makes several unconvincing arguments as to why a duty to investigate should not have been imposed on him based on the invoices. First, he argues that "the trial court relied on hearsay contained in the invoices" to find that Barakat was Hanson Bridgett's client. Notwithstanding

---

[5] We deny Smith's request for judicial notice with respect to the complaint Smith separately filed against Hanson Bridgett since it is not relevant to our determination that Smith's claims are time-barred. (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4.) We also deny Smith's motion to strike Barakat's opposition to the request for judicial notice.

17

the fact that Smith did not raise this objection below, the invoices themselves are attached as an exhibit to the third amended cross-complaint. Facts appearing in exhibits attached to a complaint are accepted as true and take precedence over any contradictory allegations in the pleading. (*Holland*, *supra*, 86 Cal.App.4th at p. 1447.) We find no error in the trial court's reliance on the contents of the invoices.

Second, Smith argues that the contents of the invoices did not create any ambiguity from Smith's perspective since Barakat was acting as the intermediary between himself and Hanson Bridgett. However, the standard for purposes of the delayed discovery rule is whether Smith was aware of circumstances that would have put a reasonable person on inquiry. (*Sanchez v. South Hoover Hospital*, *supra*, 18 Cal.3d 93 at p. 101.) The invoices, especially coupled with Barakat's and Hanson Bridgett's alleged lack of work after January 2013, were circumstances which obligated Smith to at least investigate the issue. Third, Smith argues that he had no obligation as a lay client to second-guess whether his attorney was effectively representing him. While that may be true in terms of case strategy and tactics where the attorney is the expert, here Smith had no indication that Barakat and Hanson Bridgett were doing anything at all after January 2013.

Smith's conclusory allegations are insufficient as a matter of law to withstand demurrer. (*Fox*, *supra*, 35 Cal.4th at p. 803 [the suspicion of wrongdoing triggers the statute of limitation, "unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action"].)

*C. Smith Incurred Damages in 2013.*

Lastly, Smith argues as an alternative basis for delayed accrual that his causes of action did not accrue until he received a settlement in the

qui tam cases in 2020, which in turn triggered his obligation to pay Barakat. But as the trial court pointed out in its prior order sustaining the demurrer to the second amended cross-complaint, "Smith's new tort claim is for damages, not for rescission, and the damages are the $43,000 paid to Hanson Bridgett, not the $6.7 million due to BCI under the contract and addenda." The damages, therefore, were incurred in 2013, when the $43,000 was paid to Hanson Bridgett. The third amended cross-complaint itself alleges that the $43,000 paid in 2012 and 2013 to Hanson Bridgett are Smith's actual damages that were incurred as a result of Barakat's fraud.

Further, the trial court had previously adjudicated the issue of whether Smith had adequately alleged damages in connection with his prior rescission claims and held that he had not, as "[a]ny amount [Smith] is required to pay BCI under the contract is not something he can get back as damages." The court granted leave to amend, and Smith thereafter alleged that his incurred, actual damages were the $43,000 paid to Hanson Bridgett (as well as the fees incurred to defend against Hanson Bridgett's adverse actions in 2020). He cannot attempt to now argue around his own allegations.

Finally, as discussed above, since we hold that a reasonable person should have investigated Hanson Bridgett's role after receiving the invoices in 2013, we find no merit in Smith's related argument that the delayed discovery rule applies because he did not know he was injured by the $43,000 payment until 2020.

### 4. *The Trial Court Did Not Abuse its Discretion in Denying Leave to Amend.*

If the trial court sustains a demurrer without leave to amend, "we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we

reverse; if not, no abuse of discretion has occurred.  [Citation.]  The plaintiff has the burden of proving that an amendment would cure the defect." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  However, "[a] plaintiff may not avoid a demurrer by pleading facts or positions in an amended complaint that contradict the facts pleaded in the original complaint or by suppressing facts which prove the pleaded facts false." (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 877.)  This is otherwise known as the sham pleading doctrine.  (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425.)

As an initial matter, Smith argues that the trial court abused its discretion in restricting the scope of his permitted amendments to the second amended cross-complaint.  In its order sustaining the demurrer to the second amended cross-complaint, the court permitted Smith to amend his pleading to address four specific subject matters and also permitted Smith to add three additional, short paragraphs as to any subject matter.  The court justified this limitation on the scope of amendments on the ground that, from the outset, Smith had filed an unduly repetitive cross-complaint with "lengthy recitations of evidentiary facts as well as argument about evidence."  Because Smith does not contend that the trial court's criticisms were unwarranted nor demonstrate that the limits the court imposed were responsible for his failure to address the deficiencies in his allegations, we find no abuse of discretion.

Next, in his opening brief, Smith makes a conclusory argument that he could further amend to "clarify that prior to 2020, he was ignorant of and could not have discovered: Barakat's abandonment/fraud, injury from the $43,000 payment, and an existing right to rescind."  In his reply brief, Smith argues for the first time that he could add, based on BCI's verified discovery responses, further allegations that he was misled to believe that he was

20

benefiting from an " 'ongoing consulting relationship' into 2020."[6] As these discovery responses were not included in the record, Smith filed a motion asking us to take evidence on appeal, requesting that we consider BCI's discovery responses in addition to the 2012 emails from Hanson Bridgett. We deny Smith's motion and find that the trial court did not abuse its discretion in denying leave to amend after providing Smith two opportunities to cure the defects with respect to the statute of limitations.[7]

In his motion, Smith first argues that Barakat's "lack of candor" in contending on appeal that he did no work for Smith between 2013 and 2020 provides a basis for us to consider his discovery responses, which indicate that there *was* in fact an ongoing consulting relationship, with some services provided after 2013. Barakat's brief, however, does not make this contention; it was merely summarizing Smith's own allegations that Barakat performed no work after 2013 which, for purposes of a demurrer, the court accepts as true. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) Further, because allegations are accepted as true at the demurrer stage, Smith could simply have stated what his proposed amendments would be and does not need to support them by proffering the discovery responses and emails as evidence. "When analyzing a demurrer, we look '*only* to the face of the pleadings and to matters judicially noticeable and not to the evidence or other extrinsic matter.' " (*Milligan v Golden Gate Bridge Highway & Transportation Dist.* (2004) 120 Cal.App.4th 1, 5.)

---

[6] The discovery responses are dated October 14, 2021, which was before Barakat filed a demurrer to the second amended cross-complaint. Smith, however, did not reference these discovery responses in his oppositions to any of the demurrers.

[7] We deny as moot Barakat's motion to strike Smith's notice of lodging material; that motion was rendered moot by Smith's subsequent filing of the motion to take evidence, which involves the same documents.

While it appears that Smith's proposed new allegations contending that the consulting relationship continued past 2013 would be barred by the sham pleading doctrine (*Deveny v. Entropin, Inc.*, *supra*, 139 Cal.App.4th at p. 425), we find it unnecessary to resolve the issue on that basis. The threshold problem is that Smith waited until his reply brief to state for the first time that he could further amend his pleading to allege that there was an "ongoing consulting relationship" based on BCI's discovery responses. It is well settled that issues or points raised for the first time in a reply brief will generally not be considered unless good reason is shown why appellant could not have presented them earlier. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 56.) That rule applies to situations in which the appellant contends that leave to amend would not be futile. (See *Physicians Committee for Responsible Medicine v. Los Angeles Unified School* (2019) 43 Cal.App.5th 175, 193 [declining to consider proposed amendment raised for the first time in reply brief on appeal]; *Trustees of Capital Wholesale Electric etc. Fund v. Shearson Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617, 626–627 [declining to grant leave to amend on appeal where plaintiff sought leave in trial court, but did not indicate substance of proposed amendment until reply brief on appeal].)

Here, Smith had the burden to show how his proposed amendments would cure the defects found below. To meet this burden, Smith was required to "set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.] Allegations must be factual and specific, not vague or conclusory." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43–44.) To that end, we are unpersuaded by Smith's argument that his reply brief did not contain any new issues but merely "elaborated" on the points made in his opening brief. Smith's opening

22

brief contained a conclusory statement that he could amend to allege that he could not have discovered Barakat's fraud before 2020.  Smith provides no reason why he could not have discussed the proposed amendments in his opening brief, especially since he had BCI's discovery responses since late 2021.  We therefore do not consider the new points raised for the first time in Smith's reply brief.

**DISPOSITION**

The judgment is affirmed.  Cross-defendants shall recover their costs on appeal.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
FINEMAN, J. [*]

---

[*] Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23
